STATE OF CONNECTICUT *v.* LANCE WARGO
(SC 16186)

McDonald, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued April 18—officially released December 19, 2000

*Moira L. Buckley,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Joan K. Alexander,* former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Lance Wargo, guilty of one count of murder in violation of General Statutes § 53a-54a (a),[1] two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (1) and (4),[2] one count of tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1),[3] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21.[4] The trial court rendered judgment in accordance with the jury verdict

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

[3] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

[4] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals are likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

and sentenced the defendant to a total effective prison term of fifty years. On appeal,[5] the Appellate Court affirmed the judgment of the trial court. *State* v. *Wargo*, 53 Conn. App. 747, 768, 731 A.2d 768 (1999). We granted the defendant's petition for certification limited to the following three issues:

"1. Whether the Appellate Court correctly determined that the admission of the medical examiner's testimony regarding possible causes of death that leave markings only on the skin was harmless error?

"2. Whether the Appellate Court correctly determined that the hearsay testimony of three witnesses regarding statements made to them by the defendant's children was properly admitted under the excited utterance exception to the hearsay rule?

"3. Whether the Appellate Court correctly determined that witness testimony regarding the [victim's] fearful state of mind regarding the defendant was relevant to prove his motive to murder her and was more probative of his motive than it was prejudicial to the defendant?" *State* v. *Wargo*, 250 Conn. 922, 922–23, 738 A.2d 662 (1999).

As to the first certified issue, we conclude that, contrary to the determination of the Appellate Court, the trial court did not abuse its discretion in permitting the state to elicit testimony from the medical examiner regarding possible causes of death that commonly leave markings only on the skin. With respect to that issue, therefore, we conclude that the Appellate Court properly rejected the defendant's claim, though not because the trial court's evidentiary ruling was harmless error, as the Appellate Court held, but, rather, because the trial court's ruling simply was not erroneous. As to the

---

[5] The defendant appealed to this court and, pursuant to Practice Book § 65-1, we transferred the appeal to the Appellate Court.

second and third certified issues, we answer both in the affirmative. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the facts that the jury reasonably could have found. "On November 19, 1994, at approximately 3:19 a.m., Ronald McClain and Sheila McClain, neighbors who lived across the street from the defendant [on Hillside Avenue in Plymouth], awoke to screams from the defendant's children. Ronald McClain observed an orange glow coming from the left side of the [defendant's] house. He also observed the defendant's two children on the roof of the front porch, a ladder against the front porch and the defendant standing at the bottom of the ladder. [Ronald] McClain called 911 and went downstairs to let the [defendant and his children] into [McClain's] home. The children were screaming that their house was on fire and that they could not find their mother [Wendy Wargo].[6] The defendant stated that his wife was in the house, that he could not get her out and that he did not know if she had come home. The children remained at the McClain home while the defendant and Ronald McClain returned to the burning house. The defendant again stated that he did not know if his wife had come home that evening.

"The firefighters arrived a few minutes later and found the defendant outside the house, confused and attempting to put water on the fire with a garden hose. The defendant told the firefighters that he did not know his wife's whereabouts. Later, the defendant, while he pointed to the den, told fireman Frederick Telke, 'Yes, she's in here, she's in here.' When asked if he was sure, the defendant walked to the driveway and pointed to his wife's car.

---

[6] Wendy Wargo is interchangeably referred to throughout this opinion as the Wargo children's mother, the defendant's wife and the victim.

"Firefighters entered the home and approached the den, where the fire was concentrated, but were unable to remain due to the high temperatures, heavy smoke and unstable floor. The body of the victim . . . was later found in this area. Firefighters also entered the second floor of the house and found only smoke damage. They did not hear any smoke detector alarms.

"Several hours later, Officer Gerald Allain of the Plymouth police department questioned the defendant. The defendant stated that the victim smoked cigarettes and that he recalled the smoke alarms going off. He stated that the thick smoke forced him to his knees [and that] he took the children to the porch roof.

"On November 19, 1994, the defendant gave a signed, written statement to the police. He indicated that the victim slept on the couch because their marriage was 'on the rocks.' That same day, the defendant told the victim's uncle, James Castiola, that he knew what had happened. He stated that the victim had come home, and had lain down on the couch, [near] approximately fifty videotapes. While on the couch, the victim had lit a cigarette and had fallen asleep. The defendant told Castiola that the fire had been accelerated by the videotapes, which cannot be put out when they catch fire.

"State Trooper Kevin McGurk was assigned to determine the cause and origin of the fire. He examined the Wargo home the following morning and determined that the fire originated in the den. McGurk discovered a pour pattern leading up to the area of origin, which indicated that an accelerant had been used. On the basis of his observations, McGurk concluded that the fire had been intentionally set. Other officers executed a search warrant on the Wargo home and retrieved an empty bottle of bleach from the basement and a can of acetone from the storage shed. Joseph Cristino, a forensic analysis engineer, examined the two smoke detectors

retrieved from the Wargo home. [Cristino found that it was 'highly improbable' that the first floor smoke detector was working at the time of the fire and that, had the battery been connected to the second floor detector, there was a high probability that it would have worked at the time of the fire.]

"A notebook also was seized from the defendant's bedroom dresser. The parties stipulated that the notes contained therein were written in the defendant's handwriting. The defendant was a member of the fire brigade at work and had received training in chemical fires and hazardous materials. The defendant was familiar with spontaneous combustion caused by the combination of alkalies and acids. The defendant admitted writing various phrases in the notebook, such as 'lock box in shed,' 'tool box,' 'acetone,' 'alcohol clorox,' 'alm foil,' 'dry run,' 'rope kds drs,' 'straps,' 'pillow,' 'oil in can,' 'rid of stuff,' 'glvs,' 'hat,' 'shirt,' 'cigs,' and 'ldr.' The defendant stated that these abbreviations could have been a camping list, but that he did not know why he wrote these abbreviations." *State* v. *Wargo*, supra, 53 Conn. App. 750–52. Additional facts will be set forth as necessary.

## I

The defendant first claims that the trial court improperly allowed the state to question Malka Shah, the state's associate medical examiner, about causes of death that often result in injuries only to the skin. We disagree.

The following additional facts are relevant to our resolution of this claim. On direct examination, Shah testified about the results of the autopsy that she had performed on the victim. Shah explained that the victim's body had been burned beyond recognition, and that the victim could be identified only by reference to her dental records. Shah further stated that the victim's body was so badly charred that she was unable to con-

duct an examination of the victim's skin. Shah, however, indicated that she was able to examine the victim's internal organs, including her lungs. Shah stated that, on the basis of her examination of those organs, the victim "definitely" had died prior to the fire.[7] Moreover, although Shah testified that she could not determine either the cause of the victim's death or the manner in which she had died, Shah's examination of the victim's internal organs revealed that the victim had not died of natural causes.

Thereafter, the state queried Shah about whether there are any traumatic causes of death that commonly manifest injuries only on the skin. Shah responded in the affirmative, and the state then asked Shah to enumerate those causes of death. The defendant objected to the question, and the trial court excused the jury. On voir dire examination outside the presence of the jury, Shah testified that "many . . . asphyxial deaths . . . drug overdose deaths . . . [and deaths by] electrocution" manifest injuries "only on the skin."[8] At the conclusion of Shah's voir dire testimony, the defendant sought to have the state barred from presenting such testimony to the jury. Specifically, the defendant argued that, because Shah could not determine the victim's cause of death, her testimony regarding these potential causes of death was irrelevant, speculative and highly prejudicial.

---

[7] Shah explained that the lack of soot in the victim's lungs and larynx and on the victim's tongue, coupled with the low level of carbon monoxide in her blood, led her to conclude that the victim "was definitely dead before the fire."

[8] With respect to fatal drug overdoses, Shah testified that needle marks or tracks frequently are found on the victim's skin. Shah further testified that death by electrocution usually results in only very localized burns. Finally, Shah indicated that traumatic asphyxiation caused by strangulation or choking can be determined by examining the skin of a victim's neck, along with that victim's neck muscles and local organs. Shah stated that she was unable to examine the victim's neck muscles, local organs and skin because the victim's body had been too badly burned.

The trial court overruled the defendant's objection, concluding that the testimony was relevant to explain Shah's inability to pinpoint the victim's cause of death. The trial court also concluded that any possible prejudice to the defendant stemming from Shah's testimony could be mitigated on cross-examination, especially in view of Shah's testimony that she could not determine the cause of the victim's death. Finally, the court expressly found that any prejudicial effect of the testimony was outweighed by its probative value. The jury then was recalled and Shah testified in a manner consistent with her voir dire testimony. In addition, Shah noted in her testimony that toxicological tests indicated that the victim had not died from a drug overdose and also indicated that the victim's injuries were not consistent with death by electrocution.

On appeal to the Appellate Court, the defendant renewed the claim that he had made in the trial court regarding Shah's testimony identifying certain possible causes of death. The Appellate Court agreed with the defendant, concluding that, because Shah was unable to determine the victim's cause of death to a reasonable medical probability, her testimony regarding death by asphyxiation, drug overdose or electrocution was irrelevant and, therefore, inadmissible. *State* v. *Wargo*, supra, 53 Conn. App. 759.[9] The Appellate Court further concluded, however, that Shah's objectionable testimony was harmless because, notwithstanding its lack of relevance, its admission likely did not affect the verdict.

---

[9] The Appellate Court reasoned: "Shah testified that the victim had died before the fire started and that the victim had not died of natural causes. She further testified that she could not determine the cause of death. The fact that, in forensic science, death by asphyxiation, drug overdose or electrocution may be determined by markings on the skin is irrelevant because Shah could not provide any connection between those causes of death and the actual cause of death of the victim. This testimony did not support a relevant fact even to a slightest degree and its admission was improper." *State* v. *Wargo*, supra, 53 Conn. App. 759.

Id. In so concluding, the Appellate Court noted Shah's own testimony that she could not determine the victim's cause of death and the fact that the trial court had underscored that testimony in its instructions to the jury. Id. Judge Foti concurred in the result reached by the majority but disagreed with its determination that the trial court improperly had allowed the state to elicit testimony from Shah about traumatic asphyxiation, drug overdose and electrocution. Id., 768–69 (*Foti, J.,* concurring). In Judge Foti's view, that testimony was relevant in explaining Shah's "seemingly contradictory position" that, although she was unable to determine the specific cause of the victim's death, she was able to determine that the victim had not died of natural causes. Id., 769 (*Foti, J.,* concurring). Inasmuch as Judge Foti also determined that Shah's testimony was not unduly prejudicial; id., 771 (*Foti, J.,* concurring); he concluded that the trial court properly had overruled the defendant's objection to the admission of Shah's testimony. See id. (*Foti, J.,* concurring).

On appeal to this court upon our grant of certification, the defendant maintains that the Appellate Court properly concluded that the trial court abused its discretion in permitting Shah to testify regarding possible causes of death. The defendant further claims, however, that, contrary to the conclusion of the Appellate Court, Shah's testimony was harmful because it is more likely than not that the jury relied on that evidence in finding that he had murdered the victim.

The state contends, as Judge Foti stated in his concurring opinion, that the trial court properly determined that Shah's testimony was admissible to assist the jury in understanding why Shah was unable to ascertain the cause of the victim's death notwithstanding her opinion that the victim had not died of natural causes. Alternatively, the state asserts that, even if the trial court improperly had overruled the defendant's objection to

that portion of Shah's testimony, the admission of that evidence was harmless error for the reasons articulated by the Appellate Court. We agree with Judge Foti and the state that, in the particular circumstances of this case, the trial court was within its discretion in allowing Shah to testify about the three possible causes of death.

"As a threshold matter, we set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . .

"Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"[Of course, a predicate to the admissibility of such testimony is its relevance to some issue in the case.] Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either

more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 180–81, 738 A.2d 586 (1999).

The defendant's claim is predicated on the principle that "[e]xpert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation." *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987); accord *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 338, 593 A.2d 478 (1991). Specifically, the defendant maintains that Shah's testimony regarding death by traumatic asphyxiation, drug overdose and electrocution was inadmissible because that testimony was cast in terms of possibilities rather than probabilities.

It is true, of course, that "[t]o be reasonably probable, a conclusion must be more likely than not." *Struckman* v. *Burns*, supra, 205 Conn. 555. In this case, however, the state did not seek to elicit an opinion from Shah as to the cause of the victim's death; indeed, Shah expressly acknowledged that she was unable to render such an opinion. Rather, Shah's testimony about causes of death that commonly leave marks or injuries only on the skin was admitted solely for the purpose of assisting the jury in understanding why, although Shah was able to determine that the victim had died prior to the fire and that her death was not attributable to natural causes, she *could not* ascertain how the victim had died. Thus, Shah's testimony was relevant to demon-

strate that, because the victim's skin had been destroyed by the fire, there were several possible causes of death that she could not rule out *which would have been consistent with an intentional killing*. In the absence of such testimony, the jury reasonably could have inferred that no such possible cause of death existed, an inference that, if Shah's testimony were credited, would have been both unwarranted and highly prejudicial to the state, which bore the burden of establishing beyond a reasonable doubt that the defendant intentionally killed the victim. We, therefore, disagree with the Appellate Court's determination that the trial court abused its discretion in concluding that Shah's testimony concerning possible causes of death was admissible.

We emphasize that our conclusion is not inconsistent with the well established rule that expert opinions regarding causation must be based upon reasonable probabilities and not mere possibilities. See, e.g., *Kilduff* v. *Adams, Inc.*, supra, 219 Conn. 338; *Struckman* v. *Burns*, supra, 205 Conn. 554–55. In the present case, the state sought to elicit Shah's testimony regarding causes of death that commonly result in injuries only to the skin, not to establish the victim's cause of death, but, rather, to explain why Shah's inability to ascertain the cause of death was not fatal to the state's contention that the victim had been killed intentionally. Indeed, Shah's testimony about death by traumatic asphyxiation, drug overdose and electrocution, cast as it was in terms of possibilities, was not admissible to prove the cause of the victim's death, but, rather, as the trial court determined, to demonstrate the existence of other causes of death that may be consistent with homicide, but which Shah could not adequately determine

because of the condition of the victim's body. The defendant's claim therefore must fail.[10]

## II

The defendant next claims that the Appellate Court incorrectly concluded that the trial court properly had determined that certain statements made by the defendant's children were admissible under the spontaneous utterance exception to the hearsay rule. We disagree.

The opinion of the Appellate Court sets forth the following relevant facts that the jury reasonably could have found. "Sheila McClain and Kimberly Fredericks, a friend of the McClains' son, watched the Wargo children [Brent, age six, and Rachael, age four] from approximately 3:30 a.m. until 7:30 a.m. on the morning of the fire. A neighbor of the Wargos, Lynn Monahan, brought her children to the McClains' house to keep the Wargo children company. [During this period, the children

---

[10] In light of our conclusion that the trial court properly allowed Shah's testimony, we do not address the defendant's contention that the court's ruling regarding that testimony was harmful error. We note, however, that the defendant, in the portion of his brief explaining why, in his view, the trial court's alleged evidentiary impropriety was harmful, points to comments made by the state's attorney during her rebuttal closing argument in which she underscored the fact that, because Shah had eliminated drug overdose and electrocution as possible causes of the victim's death, it was "logical" to infer that the victim had died of traumatic asphyxiation, such as by strangulation or suffocation, "because there is no reason [the victim] is dead naturally." Even though we do not reach the harmless error issue, we nevertheless agree with the defendant that the prosecutor should not have urged the jury to infer that the victim had died as a result of traumatic asphyxiation. Shah repeatedly stated that she could not ascertain the cause of the victim's death; according to Shah, traumatic asphyxiation was only *one possible* cause of the victim's death. Moreover, at the time that the court permitted the state to elicit that testimony from Shah, both the court and the state's attorney expressly stated that the testimony was probative to help explain why Shah could *not* give an opinion as to a specific cause of death. The defendant, however, failed to object to any part of the closing argument and did not make any claim on appeal that the objectionable portion of the rebuttal argument violated his federal or state constitutional rights.

were very upset and frightened, and frequently ran to the door to view the fire, repeatedly asking when they would see their mother.] At approximately 5 a.m., while the house was still burning, Monahan's son, James . . . heard [Brent] say that his mother was in the house and [Rachael] say ['that daddy had stepped on mommy while he was getting us out of the house.' Sheila] McClain testified that approximately fifteen minutes after [Brent] arrived at her house, he said that his parents had been fighting. Fredericks testified that [she overheard Brent tell Sheila McClain] that his parents had been fighting that night. [Fredericks further testified that she heard Brent say that 'daddy stepped on mommy while he was getting us out of the house.']

"[The defendant] objected to these statements as inadmissible hearsay. The trial court admitted these statements under the spontaneous utterance exception to the hearsay rule." *State* v. *Wargo*, supra, 53 Conn. App. 755–56.

Before addressing the defendant's claim of evidentiary impropriety, we set forth the applicable legal principles. "An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." *State* v. *Hines*, 243 Conn. 796, 803, 709 A.2d 522 (1998). Among the recognized exceptions to the hearsay rule is the spontaneous utterance exception, which applies to an utterance or declaration that: (1) follows some startling occurrence; (2) refers to the occurrence; (3) is made by one having the opportunity to observe the occurrence; and (4) is made in such close connection to the occurrence and under such circumstances as to negate the opportunity for deliberation and fabrication by the declarant. E.g., *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989); *Perry* v. *Haritos*, 100 Conn. 476, 484, 124 A. 44 (1924). "The basis for the [spontaneous] utterance exception

. . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous."[11] (Internal quotation marks omitted.) *Idaho* v. *Wright*, 497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.11.1, p. 373 ("[t]he [spontaneous utterance] exception rests on the view that such assertions, made in reaction to a startling event, are trustworthy and void of self-interest"). Thus, "[t]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial judge exercises broad discretion in deciding this preliminary question, and that decision will not be reversed on appeal absent an unreasonable exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Stange*, supra, 617.

Finally, although "circumstantial evidence of the declarant's personal perception must not be so scanty as to forfeit the guarantees of trustworthiness which form the hallmark of all exceptions to the hearsay rule"; (internal quotation marks omitted) *United States* v. *Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998); the state is not required to establish such personal observation by

---

[11] Thus, a declaration that satisfies the requirements of the spontaneous utterance exception is admissible irrespective of whether the declarant has testified or is available to testify. In this case, neither Brent nor Rachael testified at trial.

the declarant beyond any possible doubt. Rather, the question for the trial court is whether a reasonable inference may be drawn that the declarant had personal knowledge of the facts that are the subject of his or her statement. Cf., e.g., *United States* v. *Joy*, 192 F.3d 761, 767 (7th Cir. 1999); *United States* v. *Tocco*, 135 F.3d 116, 128 (2d Cir. 1998).[12] Consequently, "[d]irect proof of observation is not necessary; if the circumstances appear consistent with opportunity [to observe] by the declarant, the requirement is met." 2 C. McCormick, Evidence (5th Ed. 1999) § 272, p. 210.

With these principles in mind, we turn to the defendant's claim that the Appellate Court incorrectly concluded that the trial court properly had determined that the statements attributed to Brent and Rachael satisfy the requirements of the hearsay exception for spontaneous utterances. Specifically, the defendant asserts that: (1) the state failed to establish that the children personally observed the events that they recounted in their statements; (2) there is a likelihood that the children's statements were unduly influenced by conversations that they had overheard between the defendant and Sheila McClain about the fire, thereby seriously undermining the reliability of the children's statements; and (3) Brent's statement regarding his parents' fighting was a narration of a past event, not a spontaneous utterance.[13] We are not persuaded by these arguments.

---

[12] See also *McLaughlin* v. *Vinzant*, 522 F.2d 448, 454 (1st Cir. 1975), quoting *People* v. *Poland*, 22 Ill. 2d 175, 183, 174 N.E.2d 804 (1961) ("We do not understand the [personal knowledge] requirement to be that the party seeking to have the declaration admitted must prove by direct evidence beyond any possibility of speculation that the declarant personally observed the matters. If such were the rule, there would hardly ever be a case in which a declaration would be admissible. Rather, we think it is sufficient if it appears inferentially that the declarant personally observed such matters and that there is nothing to make a contrary inference more probable." [Internal quotation marks omitted.]).

[13] We note that, on appeal, the defendant does not dispute that, for purposes of his claim, the startling occurrence commenced when the children became aware of the fire and were removed from their house, and continued

Contrary to the defendant's first assertion, the trial court reasonably determined that the state adduced sufficient evidence to demonstrate that the declarations attributed to the children were a product of their own observations. With respect to the children's statements that the defendant had stepped on the victim "while he was getting [them] out of the house," it is clear that the children were relating what they personally had observed as they were being taken from the burning home by the defendant.[14] With respect to Brent's comments that the defendant and the victim had been fighting, the trial court properly determined that the jury reasonably could have inferred that Brent, who was present in the house that evening, had the opportunity personally to observe his parents engaged in some kind of altercation or argument prior to the fire. This determination is buttressed by the evidence indicating that Brent had specified that the altercation occurred on the night of the fire.[15]

throughout the period during which the children remained at the McClains' home and witnessed their house burning with their mother inside. See, e.g., *United States* v. *Tocco*, supra, 135 F.3d 128 ("realization that people could be trapped in [a] burning building" comprises startling event).

[14] The same is true, of course, with regard to Brent's statement that his mother was in the house.

[15] The defendant relies on *Johnson* v. *Newell*, 160 Conn. 269, 278 A.2d 776 (1971), to support his claim that the evidence of personal observation was insufficient to warrant the admission of the children's statements. In *Johnson*, the plaintiff was injured when he lost control of his car and struck a utility pole as a result of a blowout of one of the car's allegedly defective tires. Id., 273. The plaintiff elicited testimony from a witness who, along with his nephew, was standing in his driveway when he heard a noise that sounded like a tire blowout. Id., 277. The witness further testified that he then observed the plaintiff's car drive by and strike a telephone pole. Id. The plaintiff also sought to elicit testimony from the witness, under the spontaneous utterance exception, that his nephew, upon hearing the noise, stated that "that sounds to me like a shot or blow out . . . ." (Internal quotation marks omitted.) Id., 278. The trial court rejected the plaintiff's claim that the nephew's statement constituted a spontaneous utterance and refused to allow the witness to testify regarding that statement. Id. On appeal, this court, after underscoring the fact that the nephew "did not see the accident," but, rather, "only heard it"; id.; concluded that the trial court

We also reject the defendant's claim that the statements were inadmissible because the two children necessarily were influenced by certain conversations that they had overheard shortly after they were removed from the burning house. Specifically, the defendant points to several comments by the defendant and Sheila McClain indicating that the victim was still in the burning home. Although there is a reasonable likelihood that the children heard those statements, there is nothing in the record to substantiate the defendant's claim that the statements undermined the reliability of the children's assertions. Indeed, there was no reference by the defendant, Sheila McClain or anyone else to a fight or altercation between the defendant and the victim, nor was there any such reference to the defendant stepping on the victim as he took the children out of the house.[16] In such circumstances, we can discern no basis

properly had determined that the nephew's statement did not qualify as a spontaneous utterance. Id., 279. The defendant contends that the present case is governed by *Johnson* because there is no direct evidence that the Wargo children actually observed the incidents that are the subject of their statements.

We disagree with the defendant's contention. *Johnson* is factually distinguishable from this case because in the present case, unlike in *Johnson*, the evidence was sufficient to permit an inference that the declarants, i.e., Brent and Rachael, *actually had observed* the events to which they referred in their statements. We note, moreover, that the reasoning we employed in *Johnson* has been criticized as "illogical, inasmuch as the issue was whether an accident was caused by a tire blowout, and since the declarant had personally *heard* the noise, no reason appears why he was not a qualified 'earwitness' to the noise for purposes of the [spontaneous utterance] rule." (Emphasis added.) C. Tait & J. LaPlante, supra, § 11.11.4, p. 374. In light of our conclusion that *Johnson* does not control our resolution of the defendant's claim, however, we need not address the question of whether our analysis of the spontaneous utterance issue in *Johnson* was flawed.

[16] As the defendant notes, Brent, like the defendant and Sheila McClain, made reference to the victim's presence in the burning house. Brent also indicated, however, that the defendant had stepped on the victim as he was taking Brent and his sister from the house. It is apparent, therefore, that Brent's statement regarding the victim's presence in the house was predicated on his own observation of the victim and his realization that she had not accompanied him to safety, and not on anything that the defendant or Sheila McClain had said.

for the defendant's claim that the children's statements were influenced by anything that they may have overheard.

The defendant also claims that Brent's statement regarding a fight between the defendant and the victim was a narration of a past event rather than a spontaneous utterance. We disagree.

The following additional facts are necessary to our resolution of this issue. On direct examination, Fredericks testified that she had overheard Brent say to Sheila McClain that "mommy and daddy were fighting *tonight.*" (Emphasis added.) On cross-examination, however, Fredericks indicated that, although she believed that Brent had stated that the fight had occurred *that night,* she was not positive that Brent had indicated when the fight took place. On the basis of Fredericks' cross-examination testimony, the defendant contends that the evidence was insufficient to establish that Brent's statement related to an altercation that had occurred on the night of the fire and not to some prior altercation.

The defendant's claim lacks merit because the state was not required to establish beyond a reasonable doubt a temporal link between Brent's statement and the fight. Rather, Fredericks' testimony about Brent's statement was admissible as long as a reasonable inference may be drawn that an altercation between the defendant and the victim had occurred on the night of the fire. Fredericks testified that, based on her recollection, Brent had indicated that the altercation occurred on the night of the fire. The fact that she was not certain that Brent's statement included a reference to the time of the altercation goes to the weight of the evidence and not to its admissibility. Therefore, the trial court properly determined that Fredericks' testimony provided a sufficient temporal nexus between Brent's state-

ment and the altercation between the defendant and the victim on the night of the fire.[17]

## III

Lastly, the defendant claims that he is entitled to a new trial because the trial court improperly permitted a friend of the victim, Irene Ellis, to testify about a conversation that she had had with the victim on November 16, 1994, three days before the fatal fire. In that conversation, the victim iterated her decision to seek a divorce and, in addition, expressed her belief that the defendant would have killed her during a domestic argument approximately two weeks earlier if their daughter had not been awakened by the altercation. We disagree with the defendant's claim.

The following additional facts are relevant to our resolution of this issue. On November 1, 1994, the victim had the defendant served with divorce papers. Soon thereafter, the defendant placed a telephone call to Christina Fuggetta, a close friend of the victim and the defendant. Fuggetta testified that the defendant had told her that the victim, who already was receiving counseling, had rejected the defendant's request that she allow him to join her in those counseling sessions.

---

[17] The defendant also asserts that the trial court improperly failed to exclude Fredericks' testimony in light of evidence adduced at trial that, during an interview that defense counsel conducted with Brent and Rachael in the presence of their guardian and a Bristol police officer some two years after the fire, the children indicated that they had not witnessed their parents fighting on the night of the fire, but, rather, on a previous night. Again, this evidence goes to the weight to be afforded Fredericks' testimony and not to its admissibility. The jury reasonably could have credited Fredericks' recollection that Brent had stated that the fight occurred on the night of the fire. Moreover, the jury reasonably could have concluded that Brent's statement, as recalled by Fredericks, made relatively soon after the altercation, more reliably reflected what had transpired that night than Brent's or Rachael's recollection of the events two years thereafter. We, therefore, conclude that the trial court did not abuse its discretion in allowing Fredericks' testimony notwithstanding the children's conflicting statements two years later.

After Fuggetta advised the defendant "to move on with his life and . . . seek counseling [himself]," the defendant became angry and stated that he did not intend to become a "weekend father" and have someone else raise his children. The defendant then asserted that he would "rather see [his wife and children] dead than have her raise the kids and corrupt them." Fuggetta told the defendant not to "be stupid," and that "[i]f [he] did anything to [the victim, he would] end up in jail." The defendant, however, responded that "he'd rather see [the children] with no parents at all [than] have her corrupt them."

Ellis, who had been friendly with the victim since grammar school, testified that she had received a telephone call from the defendant on November 7, 1994. Ellis, who was residing in New Mexico at the time,[18] stated that the defendant had asked her to return to Connecticut to try to convince the victim not to obtain a divorce and to seek marriage counseling. After explaining that she could not come to Connecticut, Ellis told the defendant that the victim did not love him any more and that there was no chance of a reconciliation. Ellis testified that the defendant then told her that he and the victim "just had a big blow out" that had "got[ten] a little out of hand." The defendant further explained to Ellis that he and the victim were home together, that he had consumed a few drinks, and that he had thrown ice cubes at the victim, called her names and yelled at her. The defendant told Ellis that when the victim finally got up to leave the room, the defendant followed her to the top of the stairway and slammed her against the wall,[19] repeatedly "telling her . . . to

---

[18] Ellis had moved from Connecticut to New Mexico in 1987.

[19] Ellis testified that the defendant had told her that the victim had stumbled down the first few stairs. Ellis initially testified that the defendant had indicated that he had pushed the victim down the stairs. Ellis thereafter stated that the defendant "said he didn't push her, she just missed a few stairs."

get her f'n ass downstairs to the basement so [that] he could beat the shit out of her and kill her." The altercation ended when the couple's daughter awoke and called out to them.

Ellis further testified that, according to the defendant, the victim "was taking him for everything he had. She was taking the house [and] the kids. He wasn't going to be a weekend father or a Sunday father . . . and that he worked too damn hard for his money, his house, his family [and] for [the victim] to fuck it up for him." Finally, in response to Ellis' query as to why the defendant would "want to stay with somebody that doesn't love [him]," the defendant stated to her that "he would rather see [the victim] in hell, if it came to that."

Theresa Luther, the victim's mother, also testified for the state. Luther stated that the defendant had stopped by her house one evening prior to the fire and told her that the victim wanted a divorce. The defendant asked Luther if she would agree to speak to the victim to try to talk her out of proceeding with the divorce, and Luther agreed to raise the subject with the victim. Approximately one week later, Luther informed the defendant that she had spoken to the victim and that the victim "had made the decision that she could not reconcile with [the defendant] and [that] she was going ahead with the divorce." Luther further testified that the defendant responded that he would make the victim's life a "living hell" if she did not reconcile with him.

The state then recalled Ellis to testify about a second telephone conversation that she had had with the victim on November 16, 1994, three days before the fire. The defendant objected to Ellis' testimony, and the parties conducted a voir dire examination of Ellis outside the presence of the jury. Ellis testified that, in her telephone conversation with the victim on November 16, 1994, the victim stated that she had no desire to reconcile with

the defendant and that she had made a final decision to obtain a divorce. Ellis further testified that the victim also referred to the encounter that she had had with the defendant in which the defendant slammed her against the wall and threatened to kill her. With respect to that altercation, Ellis testified that the victim told her that she feared that the defendant would have killed her if their daughter had not been awakened by the disturbance.

The defendant objected to Ellis' testimony about the November 16 telephone conversation on the ground that it was not relevant to any issue in the case. The state maintained that Ellis' testimony was admissible to establish circumstantially the victim's state of mind which, the state further claimed, was relevant to what the state asserted was the defendant's motive to kill the victim, namely, the deteriorating state of their marriage as reflected in her decision to seek a divorce. After thoughtful consideration of the applicable precedent, the trial court overruled the defendant's relevancy objection to Ellis' testimony and, in addition, concluded that the probative value of the proffered testimony outweighed its prejudicial effect. The jury then was recalled and, in accordance with the trial court's ruling, Ellis testified in a manner consistent with her voir dire testimony.[20] Immediately thereafter, the court

---

[20] Ellis testified in relevant part as follows:

"[Joan Alexander, Assistant State's Attorney]: And in that phone conversation, did you bring up the topic of [the victim's] divorce?

"[Ellis]: Yes.

"[Assistant State's Attorney]: And did she indicate to you whether or not [they] were going to be reconciled?

"[Ellis]: She said absolutely not, that they were not going to reconcile. She was going ahead with the divorce and that was her final decision.

"[Assistant State's Attorney]: And did she indicate to you anything regarding her concerns or fears of the defendant? . . .

"[Ellis]: Her biggest fear was that if it hadn't been for [their daughter] waking up the night things got out of hand, as [the defendant] stated to me prior, that she felt if [their daughter] hadn't woken up that night that she would have been dead then."

instructed the jury that Ellis' testimony was admissible only for the limited purpose of "demonstrating the victim's . . . state of mind as [it] relates to the relationship that existed between [the victim] and the defendant and as that relates to [the] question or issue of . . . reconciliation [by the victim and the defendant]."[21]

On appeal, the defendant renews the claims that he raised in the trial court. We agree with the Appellate Court that the trial court did not abuse its discretion in allowing the admission of Ellis' testimony regarding her telephone conversation with the victim three days before the fire.[22]

As we previously have stated; see part II of this opinion; an out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay

[21] The trial court instructed the jury in relevant part as follows: "[T]he foregoing evidence has been admitted for a limited [purpose] and, accordingly, it's necessary that I give you a cautionary instruction on the matter. You are specifically instructed that this evidence has been admitted for a limited purpose, that is, for you to consider it, giving whatever weight you feel it deserves on the state of mind of the victim . . . as that relates to the marital relationship of the parties at the time. In other words, it is to be considered for that purpose and for no other purpose. You may consider the evidence with respect to the victim's state of mind at the time . . . only regarding the subject of reconciliation as that's come up during the course of the evidence, and I specifically inform you or instruct you that it's not offered as any direct proof of any element of a crime charged, but as stated, may only be considered and weighed by you with respect to this issue or subject of reconciliation at that time. Similarly, it is not offered and is not admitted as being probative of the defendant's conduct on November 19, 1994, and is not to be considered by you as probative of the defendant's conduct on that date. And furthermore, it is not offered as probative of the defendant's state of mind at that particular time. Again, the evidence has been admitted for you to consider and give it whatever weight you feel it deserves with respect to demonstrating the victim's . . . state of mind as [it] relates to the relationship that existed between [the victim] and the defendant and as that relates to this question or issue of an intended reconciliation."

[22] The defendant does not dispute the admissibility of any of the other trial evidence that is relevant to this claim, including Ellis' testimony regarding her earlier telephone conversation with the defendant on November 7.

unless the statement falls within a recognized exception to the hearsay rule. E.g., *State* v. *Hines*, supra, 243 Conn. 803. "An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 237–38, 690 A.2d 1370 (1997); accord *State* v. *Blades*, 225 Conn. 609, 632, 626 A.2d 273 (1993). Of course, for any such out-of-court statement to be admissible, it must be relevant to an issue in the case.

Inasmuch as the victim's statements to Ellis on November 16 were admitted for the limited purpose of establishing the victim's state of mind, the defendant does not dispute the fact that those statements are not hearsay. The defendant claims, rather, that the statements were inadmissible because the victim's state of mind was irrelevant to the case.

"Whether the victim's state of mind is relevant depends . . . on the nature of the issues at trial." *State* v. *Crafts*, 226 Conn. 237, 253, 627 A.2d 877 (1993). We previously have held that evidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim. See, e.g., *State* v. *Hull*, 210 Conn. 481, 501–502, 556 A.2d 154 (1989) ("[t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime" [citations omitted]); *State* v. *Thomas*, 205 Conn. 279, 285, 533 A.2d 553 (1987) ("The trial court correctly determined that [the victim's expression of fear of the defendant] was reliable circumstantial evidence of a deteriorated relationship. As such, it was relevant and probative because it tended to support the state's claim that the relationship [between the victim and the defendant] had broken down, and from that circumstance the jury could infer motive.").

In the present case, the state adduced ample evidence tending to show that the defendant had decided to kill the victim because he was extremely angry and upset that she had intended to divorce him and that, consequently, his contact with his children would be limited.[23] We, therefore, conclude that the trial court did not abuse its discretion in determining that the testimony evidencing the victim's state of mind was relevant to establish, circumstantially, the extent to which the defendant's marriage had broken down, a state of affairs

[23] We note that the Appellate Court, in explaining why the trial court properly permitted the state to adduce testimony from Ellis about her telephone conversation with the victim, stated that "[t]he defendant claimed that the victim had agreed to reconcile and not to proceed with the divorce." *State* v. *Wargo*, supra, 53 Conn. App. 755. Although he did not testify at trial, the defendant, who filed an insurance claim under his homeowner's insurance policy for losses resulting from the fire, did submit to an examination under oath as required by the terms of his policy. In the course of that examination, which the state had introduced into evidence, the defendant tended to downplay any animosity or hostility that existed between the victim and himself. He never stated, however, that the victim had agreed to reconcile and not to pursue a divorce. Rather, the defendant indicated that he had submitted a motion in his divorce case seeking statutory conciliation counseling and, in addition, that the victim had acquiesced in his request that they see a marriage counselor.

We further note that, as the state points out, the defendant's efforts to minimize the extent to which his marriage had deteriorated provides a second, albeit closely related, basis for the admissibility of the victim's statements to Ellis. "A defendant's articulated or implied theory of defense may make the victim's state of mind material to the determination of the defendant's guilt or innocence." *State* v. *Crafts*, supra, 226 Conn. 253. Indeed, as one prominent commentator has stated, this court has "not limited the use of the victim's state of mind to affirmative defenses recognized by law, such as self-defense or suicide . . . ." C. Tait & J. LaPlante, Connecticut Evidence (Sup. 2000) § 11.13.1, p. 247. Rather, we have "permit[ted] its use to rebut *theories* of defense, such as a claim of innocence." (Emphasis in original.) Id. Moreover, we have approved the use of testimony about a victim's expressions of fear of the accused when such evidence "helps to rebut aspects of [an] asserted defense." (Internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 634. In light of this precedent, the victim's statements to Ellis also were admissible to rebut the implication, raised by the defendant in his examination under oath, that reconciliation between the defendant and the victim was a distinct possibility and, therefore, that the defendant had no reason to kill the victim.

that the jury reasonably could have determined provided the defendant with a motive to kill the victim.[24]

The defendant relies on *State* v. *Duntz*, 223 Conn. 207, 233, 613 A.2d 224 (1992), to support his claim that the trial court improperly permitted the state to elicit Ellis' testimony regarding her telephone conversation with the victim. In particular, the defendant claims that *Duntz* stands for the broad proposition that evidence of a victim's state of mind is not relevant to the state's asserted theory of motive. The defendant, however, misconstrues our holding in *Duntz*. In that case, the defendant, Richard Duntz, was charged with murder. See id., 209. The victim had told several people that he was frightened of Duntz, and the trial court permitted the state to call those individuals to testify about the victim's statements to show that Duntz and the victim "had an antagonistic relationship and, therefore, that [Duntz] had a motive . . . to kill the victim." Id., 233. The state adduced no other evidence to indicate that an antagonistic relationship existed between the two men. See generally id., 231–33. We concluded that the trial court's evidentiary ruling constituted an abuse of discretion because "the jury could not have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation [due to the fact

---

[24] We previously have recognized the significance that proof of motive may have in a criminal case. "While evidence of motive does not establish an element of the crime charged . . . such evidence is both desirable and important. . . . It strengthens the state's case when an adequate motive can be shown. . . . Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. . . . This factor is to be weighed by the jury along with the other evidence in the case. . . . The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. The other evidence may be such as to justify a conviction without any motive being shown. It may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 182 Conn. 220, 223–24, 438 A.2d 38 (1980).

that] the victim's expressed fear may have been subjective and unfounded." Id., 233. We also emphasized the "tremendous potential for this evidence of subjective fear to prejudice [Duntz] unfairly . . . ." Id.

In the present case, by contrast, the state, through the testimony of Fuggetta, Ellis and Luther, presented substantial evidence, wholly independent of the victim's statements, regarding the deteriorating state of her marriage to the defendant, the victim's firm decision to end the marriage and the defendant's unwillingness to accept a divorce and the resulting likelihood of reduced contact with his children. In light of this evidence, the trial court reasonably determined that Ellis' testimony about the victim's statements was probative of the defendant's motive to kill the victim.

We next consider the issue of whether, despite the relevancy of the challenged testimony, the trial court nevertheless should have excluded it as being unduly prejudicial. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling.

. . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 329–30, 746 A.2d 761 (2000).

We agree with the Appellate Court that, under the particular facts and circumstances of this case, the trial court did not abuse its discretion in concluding that the probative value of the victim's statements to Ellis outweighed any prejudicial effect that they may have had. As we have indicated, the state already had adduced evidence about the victim's resolute intention to obtain a divorce, and Ellis testified that the defendant, himself, had told her about his altercation with the victim, including his threat to kill her. In view of this other evidence, none of which the defendant seriously contested, the victim's statements to Ellis cannot reasonably be characterized as unfairly prejudicial to the defendant. Furthermore, the trial court issued a limiting instruction concerning Ellis' testimony about her conversation with the victim immediately after the completion of her testimony. See footnote 21 of this opinion.

As we have recognized, a real risk of prejudice exists "in allowing surrogates to speak for the victim pointing back from the grave." (Internal quotation marks omitted.) *State* v. *Crafts*, supra, 226 Conn. 255. Because of that risk, trial courts must take special care in evaluating the relevance of such evidence and in weighing its probative value and prejudicial effect. The court did so in this case and reached a conclusion that is fully supported by the facts and the law. Consequently, we, like the Appellate Court, reject the defendant's claim to the contrary.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.