******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DAQUAN HOLMES
(AC 38395)

Lavine, Keller and West, Js.

*Argued May 10—officially released October 18, 2016*

(Appeal from Superior Court, judicial district of New London, geographical area number twenty-one, Jongbloed, J.)

*Cameron R. Dorman*, assigned counsel, for the appellate (defendant).

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Daquan Holmes, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a[1] and criminal attempt to commit murder in violation of General Statutes §§ 53a-49[2] and 53a-54a. On appeal, the defendant claims that (1) the trial court abused its discretion in denying his motion for a new trial, (2) the prosecutor engaged in prosecutorial impropriety, and (3) even if his due process rights were not violated, this court should exercise its supervisory powers and set aside his conviction due to deliberate prosecutorial impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of May 21, 2011, Maria Fluker was outside of Chacer's bar (bar), located on Franklin Street in Norwich, with her boyfriend, the defendant. A man asked Fluker for a cigarette, which angered the defendant. An argument began involving twenty to thirty people, including the defendant. During the argument, the defendant yelled, "get my gun."

The owner of the bar, Geoffrey Chase, who observed the altercation, heard yelling about guns and knives; he said that he had specifically heard someone say, "I'm going to get my gun." Chase called 911 and reported that there were about twenty people outside his bar yelling about guns and knives. Meanwhile, Roberta Karr, a friend of the defendant, was in her apartment across the street from the bar when she heard the disturbance. In response, she went outside to pull the defendant away from the crowd and into her apartment. The defendant, however, ran back toward the crowd, where he encountered William Long, who had been inside the bar. Karr got into a vehicle driven by Fluker, and they headed toward the defendant. The defendant, his brother, Ronald Holmes, and Long got into the car.

The group drove to Long's residence and Long went inside. When he reemerged, he had a gun. Upon getting back in the car, Long handed the gun to the defendant. The group then drove to the area of Boswell Avenue and Franklin Street, where Joseph Cadet and Johnny Amy were walking across the street. Long and the defendant got out of the car and began yelling. Cadet and Amy continued to walk and informed the two men that they had the wrong guys.

Shots were fired in the direction of Amy and Cadet, and the defendant was seen holding the gun. Amy fell to the pavement, and Cadet ran away from the defendant and Long. When the defendant and Long returned to the car, the defendant was holding the gun. Fluker then drove to Mystic, and while in route, Karr saw Long throw the gun from the car. The group rented a room at a hotel in Mystic, where Crystal Smith, Long's girlfriend, arrived after receiving a phone call from Ronald

Holmes.

Scott Dupointe, an officer with the Norwich Police Department, was stationed in the area of the shooting and was parked on Franklin Avenue when he heard six to eight gunshots and immediately drove in the direction of the shots. Upon reaching the intersection of Boswell Avenue and Franklin Street, he found Cadet kneeling over Amy. At 2:37 a.m., Dupointe called dispatch to report that he heard gunshots and had arrived at the scene. After radioing dispatch about the situation, Dupointe drove down Boswell Avenue in search of the car Cadet described as the vehicle in which the defendant and Long had fled the scene. Unable to locate the vehicle, Dupointe returned to the scene.

Amy was transported to the hospital, but he was later pronounced dead. Following an autopsy, the medical examiner determined the cause of death to be a gunshot wound to the head. The scene of the shooting was processed and several defects located in an adjacent building were consistent with gunfire. Several .22 caliber shell casings and a .22 caliber live round were also found in the vicinity. On the basis of a statement made by Karr, the police recovered a Ruger .22 caliber, semi-automatic pistol that was consistent with having fired the bullets recovered at the crime scene. Upon searching Long's residence, police also located a .22 caliber hollow point round that was the same type located at the scene of the shooting. The bullet was consistent with the ammunition typically associated with the recovered pistol. In addition, the police seized a surveillance video from a nearby Laundromat that showed Cadet and Amy walking together, Amy falling to the ground, and Cadet running away and then returning to assist Amy.

A warrant was issued nationwide for the defendant's arrest, and he was arrested in New York on October 19, 2011. He was brought back to Connecticut and charged with murder in violation of § 53a-54a and criminal attempt to commit murder in violation of §§ 53a-49 and 53a-54a. Following a jury trial, the defendant was convicted of both counts. The court subsequently denied the defendant's motion for a new trial and sentenced the defendant to fifty-four years of incarceration. This appeal followed. Additional relevant facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion in denying his motion for a new trial. In his motion for a new trial, the defendant argued that "[t]here was insufficient evidence to support the jury's finding inasmuch as the defendant demonstrated through scientific evidence and various times of day within the state's evidence that the allegations offered by the state could not have happened." On appeal, the

defendant argues that the verdict was based on physically impossible conclusions that he and his cohorts could have left the bar, driven to Long's residence, and then driven to the scene of the shooting in the allotted time.[3] The defendant alternatively acknowledges, however, that he could have been at the scene of the shooting, but only if Karr and Fluker lied about the events that occurred from the time that Long left the bar to the time of the shooting, and he further argues that the facts demonstrate that the testimony of both Karr and Fluker was intentionally untrue, which rendered their testimony unreliable and untrustworthy.

We begin our analysis by setting forth our standard of review and the relevant law. "[T]he proper appellate standard of review when considering the action of a trial court granting or denying a . . . motion for a new trial . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." *Bolmer* v. *McKulsky*, 74 Conn. App. 499, 510, 812 A.2d 869, cert. denied, 262 Conn. 954, 818 A.2d 780 (2003).

When evaluating a physical impossibility claim, "[a] verdict should be set aside [w]here testimony is . . . in conflict with indisputable physical facts, the facts demonstrate that testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ. . . . Scientific evidence is relevant to a determination of what is physically impossible." (Citation omitted; internal quotation marks omitted.) *State* v. *Vazquez*, 119 Conn. App. 249, 254, 987 A.2d 1063 (2010).

The defendant set forth the following timeline. Chase called 911 at 2:25 a.m. to report the argument occurring outside of the bar. The bar's surveillance video shows Chase making this call at 2:25 a.m. The surveillance video also shows Long exiting the bar at 2:28 a.m. to join the defendant outside. The surveillance video from the Laundromat first shows Cadet and Amy walking away, and then Amy falling to the ground and Cadet running away at approximately 3:32 a.m. At 2:37 a.m. Dupointe called dispatch to report that he heard gunfire.

The defendant contends that the time stamp on the Laundromat surveillance video was exactly one hour off, and asserts that the time on the video should have been 2:32 a.m. The defendant argues that based upon the evidence, "the time elapsed between Long leaving

the bar and the earliest time the defendant could have arrived at the scene of the shooting was just under five and a half minutes." The defendant claims that the evidence shows that it would have taken the defendant between nine and thirteen minutes to get to the scene of the shooting, and therefore, he could not have been at the scene when the victim was shot. The state contends that the defendant offered no evidence to support his claim that the Laundromat video was exactly one hour off, and further asserts that the Laundromat video was less than an hour off. The state bases that argument on the fact that Dupointe called in to dispatch that shots were fired at 2:37 a.m., and contends that it is unlikely that it would have taken Dupointe five minutes to make the call that shots had been fired.

The defendant cannot prevail on this physical impossibility argument. First, the jury was free to credit or discredit any of the time stamps on the surveillance videos, leaving enough time for the defendant to have shot the victim. The 911 call made by Chase corroborated the time stamp on the bar surveillance video. Therefore, the jury, as the fact finder, was free to credit the bar surveillance video time stamp as being in general conformity with the actual time because in the video one can see Chase dialing 911, and the time on the video at that moment is proximate to the time of the call. The defendant offered no evidence in support of the assertion that the Laundromat surveillance video time stamp was exactly one hour off, and the ambulance dispatch report indicated that the dispatch call from Dupointe was received at 2:37 a.m. Thus, given the fact that Dupointe testified that he was just down the road from the scene when he heard the gunshots and that he called in to dispatch upon arriving on scene, the jury was free to infer that the Laundromat video was less than an hour off, and, therefore, that it was not physically impossible for the defendant to have been at the scene when the victim was shot.

The defendant relies on Fluker and Karr's credibility to support his argument that it was physically impossible for him to arrive at the scene of the shooting in the allotted time, however, he alternatively acknowledges that "he could have been at the scene of the shooting, but only if Karr and Fluker lied about the events that occurred from the time that Long left the bar to the time of the shooting." The defendant seems to also be arguing that the court abused its discretion in denying his motion for a new trial because the state's witnesses were so lacking in credibility that his conviction constituted a miscarriage of justice. We are not persuaded.

This court has established that "[i]n evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or

facts established by the evidence it deems to be reasonable and logical. . . . Finally, it is beyond question that the trier of fact . . . the jury, is the arbiter of credibility. This court does not sit as an additional juror to reconsider the evidence or the credibility of the witnesses. . . . Whether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Vazquez*, 119 Conn. App. 249, 255, 987 A.2d 1063, 1068 (2010).

The defendant claims that the facts demonstrate that the testimony of both Karr and Fluker was intentionally untrue, which rendered their testimony completely unreliable and untrustworthy, particularly with respect to the events that occurred from the time Long left the bar up to, and including, the time of the shooting. Although it is true that Karr and Fluker admitted to falsehoods contained in their initial statements to the police, the jury was free to make credibility determinations and to believe whatever testimony it found credible. See *State* v. *Vazquez*, supra, 119 Conn. App. 255. In denying the defendant's motion for a new trial, the court indicated that it "[found] that the evidence was sufficient to permit the jury reasonably to find the defendant guilty beyond a reasonable doubt on each of the two counts" and noted that "defense counsel ably argued that there was reasonable doubt based on the scientific evidence as well as the time frame of the events and the jury rejected those arguments." Accordingly, the court did not abuse its discretion in declining to grant the defendant's motion for a new trial.

## II

The defendant next claims that his due process rights were violated as a result of improper remarks made by the prosecutor during the questioning of a witness and during closing arguments. The state argues that none of the prosecutor's questions or remarks were improper. We agree with the state and conclude that the prosecutor's questioning of the witness and his remarks during closing argument were proper, and, therefore, did not deprive the defendant of his right to a fair trial.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)], whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair

trial. . . . These factors include the extent to which the impropriety was invited by defense conduct, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Pascal*, 109 Conn. App. 55, 67, 950 A.2d 566, cert. denied, 289 Conn. 917, 957 A.2d 880 (2008).

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in the light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 783, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). Moreover, "[w]hen reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015). "Because [some of] the claimed prosecutorial [improprieties] occurred during closing arguments, we advance the following legal principles. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments . . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693–94 A.3d 1208 (2014).

A

The defendant first claims that the prosecutor improperly questioned Smith on direct examination and redirect. Specifically, he argues that "the prosecutor repeatedly attempted to elicit from [Smith] a highly prejudicial extrajudicial statement made by Long, who did not testify, and through improper questioning of the witness effectively made known the substance of that statement to the jury—all in violation of multiple trial court orders . . . ."

The following transpired during Smith's testimony and is relevant to the resolution of the defendant's claim. Smith testified that, after receiving a phone call

from Ronald Holmes, she went to a hotel in Mystic. She further testified that Long, Fluker, Karr, Ronald Holmes, and the defendant were in the hotel room. The prosecutor asked about the atmosphere in the room and according to Smith, "[e]verybody looked a little stressed out." The prosecutor then asked what happened next, and Smith replied, "[Long] looked at [the defendant] and said," at which point defense counsel objected, and the prosecutor withdrew his question. The prosecutor then asked Smith, "Mr. Long said something; that's a yes or no," and Smith responded, "[y]es."

Next, the prosecutor asked Smith, "[d]id the defendant say something in response to what Mr. Long said?" Smith responded, "[h]e did." The prosecutor asked her what the defendant said and Smith replied, "[n]iggas disrespect, niggas get spanked." The prosecutor then asked Smith, "[w]hat did Mr. Long say that caused that reaction?" Smith replied, "[h]e said," at which point defense counsel objected. The prosecutor argued that Long's statement would explain the defendant's subsequent statement, but the court ruled that he could ask a question that would not elicit the out-of-court statement made by Long. The prosecutor then asked Smith, "what caused [the defendant] to say that?" Smith replied, "William Long said," at which point defense counsel again objected. The court sustained the objection.

Later, on direct examination, the prosecutor asked Smith, "what do you know which would cause there to be fear of the police?" and Smith stated, "I know the statement that [the defendant] made." The prosecutor then asked, "[w]as there any other statement that made you think that the police might come?" Smith replied, "[y]es." The prosecutor asked her what statement that was, and Smith responded, "Long made a statement," at which point defense counsel objected, but the court allowed her answer to stand. The prosecutor then asked Smith, "what was it that made there a concern that the police might come?" Smith replied, "[h]e said—Long," at which point defense counsel objected again, and the court heard counsel outside the presence of the jury. Defense counsel argued that the prosecutor's conduct was bordering on bad faith for continuously attempting to get Long's statement into evidence, and the prosecutor argued that Long's statement was necessary to place the defendant's statement into context. The court sustained defense counsel's objection and stated that the prosecutor could ask the witness about the defendant's statement without eliciting Long's hearsay statement. Once the jury returned, the prosecutor asked Smith what the defendant's statement meant, and she responded, "[i]t means if someone disrespects him, then he'll kill them." The prosecutor followed up by asking, "[t]his is a yes or no; did Mr. Long say anything before that statement was made that made you think that?" Smith answered, "[y]es."

On cross-examination, defense counsel asked Smith, "[a]s far as you know, William Long could have shot [the victim] right?" Smith responded, "[a]s far as I know, except for what I," at which point defense counsel interrupted her and continued with another question, to which the prosecutor objected, saying Smith did not get to finish her answer. The court allowed her to finish her answer, and she stated, "[a]s far as I know, except for what I was told in the [hotel] room." Defense counsel continued questioning her about whether Long could have shot the victim, and Smith continuously was prompted to state what she heard Long say in the hotel room. The prosecutor again objected when defense counsel continued interrupting Smith's answers, arguing that she should be allowed to answer fully, and the court ruled that defense counsel needed to allow her to answer the questions asked. Defense counsel then prefaced that he was asking yes or no questions and asked Smith, "you can't tell us anything about who shot that boy in the street on May 21, right?" The prosecutor objected, and the court ruled that Smith could answer. Smith replied, "I did hear in the hotel room who shot the man in the street."

On redirect examination, the prosecutor asked Smith, "[d]o you know who shot the man in Norwich?" Smith responded, "I was told who shot the man in Norwich." The prosecutor then asked her, "[w]ho told you who shot the man in Norwich?" Smith replied, "William Long." Next, the prosecutor asked Smith, "[w]as [the defendant] present . . . when William Long told you who shot the man in Norwich?" Smith responded, "[y]es." The prosecutor then asked what Long said to her, and defense counsel asserted another hearsay objection, which was sustained.

The defendant contends that the prosecutor made seven attempts to elicit testimony from Smith regarding a highly prejudicial statement made by Long that implicated the defendant. The defendant argues that throughout the attempts, the prosecutor defied two explicit court rulings that ordered the prosecutor to ask questions that did not elicit the statement made by Long. The state maintains that the prosecutor had a good faith basis for pursuing his line of questioning each time he returned to the subject of Long's statement to the defendant.

The content of Long's statement was not elicited from Smith, nor was it included in the prosecutor's inquiries to Smith. Although the court sustained defense counsel's various hearsay objections during the prosecutor's questioning of Smith, the court never admonished the prosecutor or ordered him to move on to a different subject, which would be expected if the prosecutor's questioning was in fact so egregious as claimed. We agree with the state that simply posing an objectionable question does not amount to an actionable impropriety.

See *State* v. *Garcia*, 7 Conn. App. 367, 374, 509 A.2d 31 (1986) ("Often, during the course of a trial, objectionable questions are asked, objections are sustained, and the trial goes on. The due administration of justice would be ill served if every time an objectionable question were asked the case would be subject to a mistrial."). Furthermore, it is important to note that many responses from Smith, harmful to the defense, were elicited by defense counsel on cross-examination. It was during cross-examination of Smith that defense counsel posed the question, "[a]s far as you know, William Long could have shot [the victim], right?" Smith responded by stating, "[a]s far as I know . . . except for what I was told in the [hotel] room." Smith's response was interrupted by defense counsel asking another question, to which the prosecutor objected, arguing that Smith did not have a chance to fully answer, and the court allowed Smith to finish her answer. It was also on cross-examination that Smith indicated that she "did hear in the hotel room who shot the man in the street."

Moreover, the prosecutor's questioning on redirect examination was invited by the court's ruling that Smith would be subject to redirect examination in response to the prosecutor's objection regarding defense counsel's not allowing her to answer. In addition, defense counsel's suggestions that the defendant's statement in the hotel room was in reference to a card game and that Smith did not know who killed the victim invited the prosecutor to inquire further into those subjects. Significantly, defense counsel did not move to strike Smith's answer after the court allowed her to finish it. Therefore, pursuant to our review of the record, we conclude that the prosecutor's questions were attributable to vigorous advocacy as opposed to impropriety.

B

The defendant also argues that the prosecutor made improper remarks during closing arguments. Specifically, the defendant contends that "the prosecutor mischaracterized evidence in his closing argument to the jury."

"[T]he prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . [W]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citations omitted; internal quotation marks omitted.) *State* v.

*Franklin*, 162 Conn. App. 78, 101, 129 A.3d 770 (2015), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016).

The defendant argues that the prosecutor made the following improper statements during direct and rebuttal closing arguments, and contends that the statements were unsupported by the record and mischaracterized the evidence: (1) "The video on the Laundromat says the body fell at 3:32:43; simply not accurate"; (2) "When [the defendant] gets back in the car, [Karr] says that she sees [the defendant] holding the gun"; (3) "[The defendant] is arguing; [Fluker] says the argument is about the fact that an individual, we would suggest the evidence might show that that individual is Cornelius Wingate"; (4) "You can see that on the video, the phone call is made, the hand gestures, and Long does in fact exit the bar just like Fluker says."

The first statement that the defendant challenges regarding the inaccuracy of the Laundromat surveillance video is conceded by the defendant, given that the defendant's claim regarding physical impossibility is premised on the fact that the Laundromat video was exactly one hour off; in other words, that the time on the video was not in fact accurate. The second challenged statement, that Karr said she saw the defendant with the gun after he got back into the car, was a proper representation of Karr's testimony.[4] Although the state agrees with the defendant that at an earlier point in her testimony, when asked whether Long held the gun the entire time in the car, Karr responded, "yea," the state maintains that Karr appeared to be referring to the time period prior to the shooting, during which the group was searching for the individual with whom the defendant had an argument.

The third statement that the defendant challenges regarding the prosecutor's suggestion that Wingate may have been the individual with whom the defendant got into a fight, was also proper, as it raised a possible inference based on the evidence in the record. Wingate testified that he had engaged in an argument outside of the bar, during which he was stabbed. He also identified Long, a man he knew from prison, as one of the individuals he was arguing with, as well as another man and a woman. According to Fluker's testimony, in the hotel room "Long said something about stabbing somebody, cutting them." Additionally, Wingate was wearing a red shirt the night of the shooting, which was seized by the police and introduced into evidence. The victim was wearing a red shirt when he was shot, which also was introduced into evidence. These facts, together with Cadet's testimony that he told the two men that encountered him and the victim in the street that they had the wrong guys, was enough to permit the inference that the shooter mistook the victim for Wingate. Finally, the prosecutor's description of the bar video, specifically his reference to hand gestures, was supported by both

the video itself and Fluker's testimony that Long left the bar because "[the defendant's brother] Ron flagged him to come outside." Accordingly, on the basis of our thorough review of the record, we conclude that no prosecutorial impropriety occurred during the prosecutor's closing arguments because his arguments were predicated on evidence produced during the trial.

### III

The defendant also claims that this court should exercise its supervisory powers and set aside his conviction due to deliberate prosecutorial impropriety. We decline that request.

"[I]n considering claims of prosecutorial [impropriety], we apply a due process analysis and consider whether the defendant was deprived of a fair trial. . . . A different standard is applied, however, when the claim involves deliberate prosecutorial [impropriety] during trial which violates express court rulings . . . . When such an allegation has been made, we must determine whether the challenged argument was unduly offensive to the maintenance of a sound judicial process. . . . If we answer that question in the affirmative, we may invoke our supervisory powers to reverse the defendant's conviction. . . . In determining whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark was to undermine the authority of the trial court's ruling . . . . We also consider the degree of prejudice suffered by the defendant as a result of the remark. . . .

"Our Supreme Court . . . has urged a cautionary approach in this regard, noting that [r]eversal of a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such [impropriety]. . . .

"In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), our Supreme Court first enunciated the principles relevant to claims of deliberate prosecutorial impropriety in violation of a trial court's ruling. Our Supreme Court held that, where such impropriety has occurred, an appellate court may exercise its inherent supervisory authority over the administration of justice to defend the integrity of the judicial system. . . . The court blatantly rejected the argument that it could upset a criminal conviction on account of prosecutorial impropriety only where such conduct had deprived the defendant of his constitutional right to a fair trial. . . . Instead, the court recognized that, given the proper

circumstances and regardless of whether deliberate impropriety deprived a defendant of a fair trial, the drastic step of upsetting a criminal conviction might be necessary to deter conduct undermining the integrity of the judicial system. . . . Thus, after weighing relevant considerations, the court placed a primacy upon its responsibility for the enforcement of court rules in prosecutorial [impropriety] cases and for preventing assaults on the integrity of the tribunal. . . . The court reasoned that it had an obligation to deter purposeful impropriety and concluded that reversal in cases involving such deliberate conduct may be warranted even where a new trial is not constitutionally mandated. . . . Hence, the touchstone of our analysis in a claim of this nature is not the fairness of the trial but the existence of [impropriety] that deliberately circumvents trial court rulings." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 296–98, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010).

The defendant maintains that the prosecutor engaged in impropriety based on his "repeated noncompliance with the trial court's explicit and unambiguous order" and "his flippant response to the trial court when the defendant objected to the repeated attempts to get Long's statement before the jury." We disagree. Although the defendant contends that the court's order was explicit and unambiguous, the only statement of the court that the defendant references in his appellate brief is the court's statement, "Well, hold on. If you wish to be heard further, maybe this is something that should be done outside of the presence of the jury." The defendant also cites the prosecutor's response to that inquiry in which he stated, "It's the court's pleasure; I don't mind doing it in front of them." The statement by the court on which the defendant relies as an explicit order seems to be phrased as a suggestion or even a question posed to the prosecutor. Furthermore, as previously noted, the court did not expressly forbid the prosecutor from continuing on his line of questioning with respect to Long's statement to the defendant, but, rather, the court sustained various hearsay objections that defense counsel made throughout the prosecutor's examination of the witness. Moreover, as previously discussed, the court did not admonish the prosecutor or reprimand him in any other way. Accordingly, it cannot be said that the prosecutor defied an order of the court. We thus decline to exercise our supervisory powers as there is no basis to do so.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in

conduct which would constitute the crime if attendant circumstances were as he believes them to be . . . ."

[3] The state argues that the defendant's claim is unpreserved because he is not challenging the court's denial of his motion based on the overall sufficiency of the state's evidence, but, rather, he is arguing that his motion should have been granted because it was physically impossible for the defendant to have been at the scene at the time of the shooting and that Fluker and Karr were not credible witnesses. We conclude, however, that the defendant sufficiently preserved this claim in his motion for a new trial in which he contended that "[t]here was insufficient evidence to support the jury's finding inasmuch as the defendant demonstrated through scientific evidence and the various times of the day within the state's evidence that the allegations offered by the state could not have happened."

[4] On direct examination of Karr by the prosecutor the following exchange occurred:

"Q. After the man fell and the men are back in the car, did you see [the defendant] with the gun?

"A. In the backseat, yeah. . . .

"Q. Did [the defendant] have the gun when he got back in the car?

"A. I believe so, yeah.

"Q. Is that a yes?

"A. Yes. . . .

"Q. When you saw the body fall, could you, in that immediate time, see one of the men with a gun?

"A. When they got back in the car, yeah, [the defendant] had the gun.

"Q. [The defendant] had the gun when he got back in the car?

"A. Mm-hmm."

———————————————