******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* OSAFA WILLIAMS
## (SC 20812)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The defendant appealed from the judgment of conviction of murder and criminal possession of a firearm. The defendant claimed, inter alia, that the evidence was insufficient to support the jury's verdict and that the trial court had deprived him of his constitutional right to present a defense when it precluded his expert witness from testifying about certain surveillance footage. *Held*:

The evidence, when construed in the light to most favorable to sustaining the verdict, was sufficient to support the jury's verdict, as the defendant did not dispute that the state presented sufficient evidence to prove the elements of the charged offenses beyond a reasonable doubt, and the physical evidence presented at trial, which potentially conflicted with eyewitness testimony, did not render the state's theory of the case that the defendant had shot the victim from inside of the defendant's vehicle a physical impossibility.

The trial court improperly applied the standard for determining the admissibility of an identification by a nonpercipient witness instead of the standard applicable to the admission of expert testimony when it precluded the defendant's expert, a private investigator with expertise in video analysis, from testifying about his observations of certain surveillance footage, and, because the trial court's error was not harmless, this court reversed the judgment of conviction and remanded the case for a new trial.

The trial court did not abuse its discretion in admitting expert testimony that one and two element particles "commonly associated with" and "consistent with" gunshot residue were detected on the defendant's hands and clothing, and in his vehicle, as courts have routinely admitted such testimony and the probative value of the testimony was not outweighed by the danger of unfair prejudice.

Argued February 16—officially released August 13, 2024*

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial dis-

* August 13, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

trict of Hartford and tried to the jury before *Schuman, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed; new trial.*

*John L. Cordani, Jr.*, assigned counsel, with whom, on the brief, were *Kathleen E. Dion* and *Mallori D. Thompson*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Sharmese Walcott*, state's attorney, and *Anthony Bochicchio*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Osafa Williams, was convicted of murder in violation of General Statutes § 53a-54a and criminal possession of a firearm in violation of General Statutes (Rev. to 2019) § 53a-217 (a) (1). On appeal,[1] the defendant claims that (1) the state failed to present sufficient evidence to prove his guilt beyond a reasonable doubt, (2) he was deprived of his constitutional right to present a defense because the trial court precluded his expert witness from testifying about surveillance footage, and (3) the trial court erred in admitting expert testimony relating to particles consistent with gunshot residue. We conclude that the defendant's conviction was supported by sufficient evidence. We further conclude, however, that the trial court applied the incorrect legal standard in precluding the defendant's proffered expert. Because we cannot conclude that this error was harmless, we reverse the judgment of conviction and remand the case for a new trial. Finally, we address the defendant's claim relating to gunshot residue because the issue is likely to arise on remand and conclude that the trial court did not abuse its discretion in admitting that evidence.

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

The jury reasonably could have found the following facts. Just before noon on April 14, 2019, Sheleese Lockhart left her home on Wooster Street in Hartford to purchase cigarettes at a nearby store on Main Street. On her way to the store, she saw the victim, Derrick Nichols, heading in the opposite direction toward the defendant's blue Acura, which was parked next to a large church located at the intersection of Wooster and Pavilion Streets. Although Lockhart did not know the victim's name, she recognized him from the neighborhood. As she was returning from the store a short time later, Lockhart heard a noise that sounded like fireworks and saw a flash inside the defendant's parked Acura.

After seeing the flash, Lockhart saw the victim exit the front passenger door of the Acura and spin around while reaching for his gun. As he did this, he was shot by the driver of the Acura. The Acura then sped away in the direction of Main Street. The victim died at the scene. An autopsy later revealed that the victim was shot a total of four times.[2]

At the crime scene, the police recovered several items belonging to the victim, including a fully loaded nine millimeter semiautomatic handgun, a gun holster and clip, a white backpack, rolling papers, cash, two cell phones, keys, and a tube containing a white, rock like substance consistent with crack cocaine for street level sales. They also recovered shell casings and a bullet approximately fifty to seventy feet from the area where the defendant's Acura had been parked.

---

[2] The medical examiner who performed the autopsy testified that one bullet entered the right side of the victim's chest just below the armpit, traveled upward, and lodged in his side; a second bullet entered the victim's torso from the right mid-back, traveled slightly downward, and exited around his navel; a third bullet entered the victim's right arm near the elbow and traveled toward his wrist, breaking both bones in his forearm; and a fourth bullet entered the victim's left arm near the elbow, fracturing a bone in his left arm.

After leaving the scene, the defendant drove to the home of Sherrell Adams, the mother of his children, who used the defendant's car to go to the store. Adams was subsequently pulled over by the police due to a "BOLO"[3] alert that had been issued for the Acura. While the police were waiting for a tow truck to transport the Acura to an impound lot, the defendant approached them and asked why his vehicle had been stopped. When he was advised that the vehicle had been seen around Wooster Street earlier that day, the defendant told the police that he had been in that area and had heard gunshots.

The defendant then went to the Hartford police station and voluntarily submitted to an interview and testing for the presence of gunshot residue on his hands and clothing. Eight days later, the interior and exterior of the Acura were also tested for the presence of gunshot residue. Gunshot residue is a substance formed by the high heat, high energy reaction that occurs when a bullet is discharged from a firearm and is comprised of three elements fused together—lead, barium, and antimony.[4] Although no samples from the defendant or the Acura contained all three elements fused together, samples containing one and two element particles were found on the defendant's hands and clothing, and in the Acura.

The defendant was subsequently arrested and charged with the victim's murder and with criminal possession of a firearm. He pleaded not guilty to both charges and elected to be tried by a jury, which found him guilty on both counts. The trial court thereafter imposed a

---

[3] "BOLO stands for be on the look out." (Internal quotation marks omitted.) *State* v. *Biggs*, 176 Conn. App. 687, 692 n.4, 171 A.3d 457, cert. denied, 327 Conn. 975, 174 A.3d 193 (2017).

[4] See, e.g., Division of Forensic Sciences, Georgia Bureau of Investigation, Gunshot Residue, available at https://dofs-gbi.georgia.gov/gunshot-residue (last visited August 12, 2024).

total effective sentence of fifty-five years of imprison-
ment. This appeal followed.

I

We first address the defendant's claim that the evi-
dence was insufficient to support the jury's verdict.[5] The
defendant contends that, in considering the evidence
collected from the crime scene, it was "physically
impossible" for him to have shot the victim from inside
the Acura—as the state had argued at trial. The defen-
dant points to the fact that much of the physical evi-
dence presented at trial, including shell casings, a bullet,
a blood like substance, and bullet damage to the victim's
vehicle, was found a considerable distance from the
Acura. The state maintains that the evidence readily
establishes the defendant's guilt beyond a reasonable
doubt. The state disputes the defendant's argument that
its theory of the case is "physically impossible," arguing
that the jury reasonably could have credited Lockhart's
eyewitness testimony concerning the murder and that
there was a sufficient evidentiary basis to explain why
the shell casings were collected away from the Acura.
We conclude that, when construed in the light most

---

[5] The defendant argues, in the alternative, that this court should order a
new trial on the ground that the verdict was "contrary to the manifest weight
of the evidence." Although the defendant argued before the trial court that
he was entitled to a judgment of acquittal on the basis of physical impossibil-
ity, he never argued that a new trial was required under Practice Book § 42-
53, and, therefore, we decline to review this claim on appeal. See, e.g., *State*
v. *Griffin*, 253 Conn. 195, 202, 749 A.2d 1192 (2000) ("On a cold record, we
cannot meaningfully assess [the state's key witness'] credibility to determine
whether his testimony, which, if credited, concededly was sufficient to
support the defendant's convictions, nevertheless was so unworthy of belief
as to warrant a conclusion that allowing the verdict to stand would constitute
a manifest injustice. . . . Only the trial judge was in a position to evaluate
[the witness'] testimony, along with the other relevant evidence, to make
such a determination." (Citations omitted.)); see also *State* v. *Soto*, 175 Conn.
App. 739, 751, 168 A.3d 605 ("[u]nder *Griffin*, moving for a judgment of
acquittal . . . does not preserve a weight [of the evidence] claim"), cert.
denied, 327 Conn. 970, 173 A.3d 953 (2017).

favorable to sustaining the jury's verdict, the evidence was sufficient to support the verdict.

The following additional facts are relevant to our analysis of this issue. At the time of the shooting, the Acura was parked on Pavilion Street near its intersection with Wooster Street. No blood, shell casings, or bullets were found inside the vehicle when it was searched by the police at the impound lot. The victim's body and gun were lying on the sidewalk in close proximity to where the Acura had been parked.[6]

At the time of the shooting, the victim's Honda Pilot was parked several spaces behind the defendant's Acura. A bullet hole was discovered in the driver's side window of the Honda Pilot, and a bullet was found inside that vehicle. A blood like substance was also collected from the exterior of the vehicle. No evidence, however, was presented at trial as to the source of the bullet damage, the bullet, or the blood like substance. During closing argument, defense counsel argued that the jury should not credit Lockhart's testimony. Specifically, defense counsel argued: "[Lockhart's] testimony didn't even make sense when you look at the physical evidence. As the state said, corroboration. You look at the physical evidence, she talks about the blue car being near the corner—parked near the corner of Wooster and Pavilion [Streets]. But . . . all the physical evidence, the . . . victim's gun . . . [t]hat was found down the street near 18 Pavilion Street . . . . Also, the four [shell casings] were found at 18 Pavilion Street, as well as [the victim's] clothes and . . . his other belongings. All 100 feet down the street. That's . . . a

---

[6] The victim's gun was recovered approximately fifty-two feet from the intersection. There was no evidence establishing the precise distance between the intersection and the Acura. The only evidence with respect to this distance was Lockhart's testimony that the Acura was parked on Pavilion Street, next to the large church, which, based on photographic evidence, demonstrated that the vehicle was in close proximity to the gun.

pretty good distance. Also, the Honda Pilot . . . which had a bullet hole in the window. A [bullet] found in the seat and some blood on the Honda Pilot. This is all down near 18 Pavilion [Street]. . . . Again, you're the judges of [Lockhart's] credibility."[7]

"A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *State* v. *Hughes*, 341 Conn. 387, 397, 267 A.3d 81 (2021). To determine whether the state presented sufficient evidence to support the jury's verdict, "we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Abraham*, 343 Conn. 470, 476, 274 A.3d 849 (2022). "In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Davis*, 324 Conn. 782, 794, 155 A.3d 221 (2017).

In most instances, claims of physical impossibility are not typically brought as claims challenging the sufficiency of the evidence. This is because, in making such a claim, the defendant does not necessarily dispute that the state presented sufficient evidence, if found credible by the jury, to support the jury's verdict. See, e.g., *State*

---

[7] It is well established that arguments of counsel are not evidence; see, e.g., *State* v. *Freeman*, 344 Conn. 503, 517–18, 281 A.3d 397 (2022); and, in the present case, the record does not support defense counsel's argument that all of the evidence was found "100 feet down the street."

v. *Hammond*, 221 Conn. 264, 267, 604 A.2d 793 (1992), overruled in part on other grounds by *State* v. *Ortiz*, 280 Conn. 686, 911 A.2d 1055 (2006). Rather, the defendant alleges that other evidence presented was so strong that the verdict was contrary to the manifest weight of the evidence. See, e.g., id. Thus, "a verdict should be set aside [when] testimony is . . . in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and [the facts] leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." (Internal quotation marks omitted.) *State* v. *Avcollie*, 178 Conn. 450, 457, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); see also *State* v. *Hammond*, supra, 268 ("[o]ne cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible").

The defendant does not dispute that the state presented sufficient evidence to prove the elements of the charged offenses. Rather, he asserts, that consideration of all of the evidence presented at trial makes "it unreasonable as a matter of law to believe" Lockhart's testimony. The defendant principally relies on *State* v. *Hammond*, supra, 221 Conn. 264, contending that the physical evidence presented at trial made it impossible for the defendant to have shot the victim from inside the Acura. In *Hammond*, this court concluded that the trial court incorrectly had determined that the jury's verdict was not contrary to the manifest weight of evidence, despite the strength of the state's case, because DNA and blood testing conclusively excluded the defendant as the victim's assailant. Id., 276. Analysis of a semen stain on the victim's clothing indicated that the assailant had type A blood, whereas the defendant's blood test revealed that he had type O blood. Id., 278. In addition, DNA analysis indicated that the defendant

could not have contributed to the semen stain on the victim's clothing. Id.

The present case differs from *Hammond* in that, here, the presence of additional physical evidence at the crime scene that poses a potential conflict with eyewitness testimony does not render the state's theory physically impossible. See, e.g., *State* v. *Bonilla*, 317 Conn. 758, 763 n.7, 120 A.3d 481 (2015) ("[a]lthough some evidence may be inconsistent with the state's theory of the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory" (internal quotation marks omitted)). Moreover, in the present case, the state presented testimony from which the jury reasonably could have determined that shell casings do not "just land and stop where they are" and that the shell casings could have moved as a result of street traffic and the crowd that gathered in the aftermath of the murder. None of these shell casings, however, was forensically connected to the victim's murder.

We view the present case as more factually analogous to *State* v. *Franklin*, 162 Conn. App. 78, 129 A.3d 770 (2015), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016), in which the Appellate Court rejected a claim that the state's theory of the case was physically impossible because the evidence collected from the crime scene seemingly contradicted eyewitness testimony. Id., 87. In *Franklin*, an eyewitness testified that, while standing in his backyard, he had seen the defendant shoot the victim in the chest in the parking lot of an apartment complex across the street. See id., 83, 85, 87 n.2. The state also presented evidence that the police had collected spent shell casings, a blood like substance, and some of the victim's belongings from inside an alcove situated between two of the buildings. See id., 83, 86. The defendant argued that, based on the eyewitness' testimony that he could not see into the alcove where

the evidence was collected, "it was 'physically impossible' for [the eyewitness'] testimony [that he had seen the defendant shoot the victim] to be true." Id., 85. The Appellate Court rejected the defendant's claim, concluding that it was "a challenge to [the eyewitness'] credibility and an argument that the jury could draw only one inference about where the shooting occurred based on the location of the [spent] shell casings." Id. Similarly, in the present case, the fact that there was physical evidence in a different location on Pavilion Street does not render the state's theory of the case—that the defendant shot the victim from inside the Acura—physically impossible. See id., 87 ("[I]t is entirely possible that the victim was running away from the alcove when he was shot and that the defendant was standing in a place where [the eyewitness] could see him. Thus, whether [the eyewitness] saw the defendant shoot the victim is a matter of credibility, not impossibility."). We conclude that, in the present case, the defendant's claim of physical impossibility is likewise a question of credibility for the jury.

The defendant attempts to distinguish *Franklin*, arguing that it dealt with only the impossibility of the eyewitness testimony—as opposed to evidence rendering it physically impossible for the defendant to have committed the crime. In the present case, however, the state's theory that the defendant murdered the victim derives directly from Lockhart's testimony that she saw shots fired from inside the Acura and the victim collapse after exiting that vehicle. The jury reasonably could have concluded, consistent with Lockhart's testimony, that the defendant had shot the victim once while they were sitting in the Acura, and, then, as the victim exited the vehicle, the defendant leaned over the passenger seat and continued to shoot as the victim fled. The absence of blood or bullets inside the Acura also did not require the jury to conclude that it was impossible

for the defendant to have shot the victim from inside the vehicle. The jury may very well have inferred that the defendant had leaned out of the Acura to continue shooting at the victim as he ran away and that the victim did not start bleeding from his gunshot wound until he exited the Acura to reach for his gun. Further, through cross-examination and closing argument, the jury was made aware of the defendant's argument that the location of the physical evidence called into question Lockhart's testimony that the victim had been shot inside the Acura. Yet, the jury still found the defendant guilty, apparently crediting Lockhart's eyewitness testimony on the basis of the location of the physical evidence. As the trial court found, "[t]hese arguments, as to the impossibility or unlikelihood of the murder occurring, or the defendant committing it, because nothing was found [in] the car . . . were made to the jury, and the jury considered them and rejected them." See, e.g., *State* v. *Holmes*, 169 Conn. App. 1, 10, 148 A.3d 581 (trial court did not abuse its discretion in denying motion for new trial based on alleged physical impossibility when "defense counsel ably argued that there was reasonable doubt based on the scientific evidence as well as the time frame of the events and the jury rejected those arguments" (internal quotation marks omitted)), cert. denied, 323 Conn. 951, 151 A.3d 847 (2016). Indeed, having credited Lockhart's testimony, the jury reasonably could have surmised that the defendant discarded any shell casings that had landed inside the Acura after the shooting but before the police seized the vehicle.

Fundamentally, "it is the function of the jury to consider the evidence and [to] judge the credibility of witnesses." *State* v. *Jackson*, 257 Conn. 198, 209, 777 A.2d 591 (2001); see id., 208–10 (rejecting defendant's argument that evidence was insufficient when physical evidence, including shell casings and bullet damage to staircase, "demonstrate[d] that the state's theory of the

case was implausible" and supported alternative theory that different individual had shot victim). Although this case presents a close question, we conclude that the evidence presented was sufficient to support the jury's verdict when construed in the light most favorable to sustaining the verdict. See, e.g., *State* v. *Whitaker*, 215 Conn. 739, 757 n.18, 578 A.2d 1031 (1990) ("this court has held that a single witness is sufficient to support a finding of guilt beyond a reasonable doubt," even without corroboration). Our determination, however, is driven by the procedural and evidentiary record before us in this appeal and does not preclude a different outcome in a case in which the record is more thoroughly developed.

We note, moreover, that Lockhart's testimony was substantially corroborated by the location of the victim's gunshot wounds. The victim was shot a total of four times. The jury reasonably could have found that his injuries were consistent with being shot once in his left arm while in the passenger seat of the Acura and, then, being shot in his right arm, in his side near his right armpit, and in the right side of his back as he exited the vehicle, spun around, and reached for his gun. Lockhart's testimony was further corroborated by the presence of particles consistent with gunshot residue on the defendant's hands, his clothing, and inside of the Acura, and the fact that the defendant quickly fled the scene after the shooting. See, e.g., *State* v. *Davis*, supra, 324 Conn. 793 ("it does not diminish the probative force of the evidence that it consists . . . of evidence that is circumstantial rather than direct" (internal quotation marks omitted)); see also *State* v. *Rhodes*, 335 Conn. 226, 243, 249 A.3d 683 (2020) ("[t]he probative value of evidence of flight depends [on] all the facts and circumstances and is a question of fact for the jury" (internal quotation marks omitted)).

Although, as defense counsel argued to the jury, the shell casings and the bullet hole in the victim's car were 100 feet from the intersection, near where the Acura was parked, there was no testimony necessarily linking any of that evidence to the victim's murder. Nothing in the record establishes that there was any testing of the evidence as to the source of the blood like substance found on the victim's vehicle, the bullets, or the shell casings. See *State* v. *Jackson*, supra, 257 Conn. 209–10 ("The defendant's claims . . . do not undermine the cumulative weight of the state's case. For example, there was no evidence presented that indicated that the bullet hole in the staircase derived from the same sequence of events that gave rise to the victim's death."). In the absence of any such testing linking this evidence to the victim's murder, we cannot conclude that it was physically impossible for the defendant to have shot the victim from inside the Acura. It is well established that, when deciding whether there was sufficient evidence to support the jury's verdict, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ward*, 306 Conn. 698, 715, 52 A.3d 591 (2012). For the reasons previously set forth, we conclude that there was sufficient evidence to support the jury's verdict.

## II

We next consider the defendant's claim that the trial court erred in precluding the defendant's expert from testifying about street camera footage capturing the crime scene in the moments before and at the time of the victim's murder. The defendant contends that the trial court applied the incorrect legal standard to evaluate the admissibility of this testimony. We agree.

The following additional facts are relevant to our resolution of this claim. Prior to trial, the defendant disclosed his intention to call Erik Eichler as an expert in measurements and video analysis.[8] Defense counsel proffered that Eichler, as a certified private investigator and certified forensic scientist, would testify as to his observations of the street camera footage, namely, "he sees the cars, he sees [the defendant] getting into the blue car, and he sees the victim walking down the street . . . walking around his car and falling down." This testimony, she argued, would aid the jury in evaluating the video because, due to the poor quality of the video, "it's hard to see exactly which car is which or what person is what." Defense counsel emphasized the necessity of this testimony, arguing that the video was not clear or self-explanatory.

The prosecutor objected to the proffered expert testimony as providing an unnecessary "play-by-play of a video that speaks for itself . . . ." He argued that, although the state planned to introduce similar street camera footage,[9] Eichler should not be permitted to testify about the substance of the video other than providing basic, orienting information, because he was not present at the scene and did not make the video. The prosecutor maintained that the footage could be adequately observed by a lay juror without an explanation from an expert as to its content.

The court then asked defense counsel whether Eichler had any prior familiarity with the defendant,

---

[8] At trial, Eichler provided testimony relating to the distances between street landmarks and some of the evidence collected from the crime scene.

[9] The state introduced a similar, although not identical, version of the street camera footage through Hartford Police Detective Steven Citta, who worked in the unit responsible for recording and maintaining street camera footage. Citta did not provide any opinion about the contents of the video, except in identifying time stamps and the names of streets captured in the recording.

the victim, or the defendant's car. When defense counsel answered in the negative, the trial court noted: "Well . . . that is a concern. But, on the other hand, I'm not . . . really seeing how this harms the state. [The proffered testimony] seems to be consistent with the state's theory." The prosecutor responded that it was consistent "to a degree" but maintained that there was no basis for permitting any witness to "characteriz[e] the actions of the parties in the video . . . ."

The next day, the trial court viewed the defendant's proffered street camera footage, marked as defendant's exhibit B for identification (exhibit B), and heard further arguments relating to the admissibility of Eichler's testimony.[10] Defense counsel maintained her argument that the video was of poor quality and "difficult to see." She also clarified that Eichler would testify "at least . . . to interpret what he's observing as to [the defendant] walking into his car, and then [the victim] walking later down the street . . . . It's basically those . . . two basic things." Eichler's testimony was essential, she argued, because of the exculpatory nature and poor quality of the zoomed in street camera footage.[11] Defense

[10] Although the parties attempted to watch the video on the first day of evidence, a technical error rendered the video unplayable. The next day, outside the presence of the jury, the trial court was able to view the video to assess Eichler's corresponding testimony. On appeal, exhibit B was also unplayable. This court sua sponte ordered the parties to rectify the record and to provide us with a playable copy of this exhibit. Defense counsel provided a new copy, marked as defendant's exhibit B1 for identification (exhibit B1), which contains a playable version of the referenced surveillance footage. The state agreed without objection that exhibit B1 contains the same footage as originally contained in exhibit B.

[11] Defense counsel also argued that Eichler's testimony was necessary because "[the defendant's] interrogation video was coming in, and, during that video, the police, while questioning [the defendant], make numerous observations—their interpretation of what's going on in the surveillance video." The prosecutor responded: "I think it's really somewhat apples to oranges in the sense that, when the detectives are questioning the defendant, they . . . quite frankly, may not have even seen the video. . . . [T]hey're allowed to . . . make statements that are misleading [and] that are not truthful." The defendant does not make any claim on appeal relating to this

counsel further argued that, "after looking at [the video] numerous times, it shows [the defendant] getting into his car and not leaving his car, and then . . . [the victim walking around his car and] falling after that. But . . . certainly, an instruction could be given to the [jurors] that . . . they would be watching the video, and their interpretation would control." The prosecutor maintained his objection to Eichler's commenting on the video and asserted that, because Eichler had no prior familiarity with the defendant or the victim, his testimony did not meet the criteria established in *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022).[12]

The trial court concluded that the issue was governed by *Gore.* See id., 150 ("nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs is admissible only if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury" (internal quotation marks omitted)).[13] After making findings under each of the four factors set forth in *Gore* for determining whether a witness is more likely to correctly identify the defendant than is the jury; see id., 151; the trial court precluded Eichler's

exchange, and we do not consider the issue.

[12] In making his argument, the prosecutor cited "the *Davis* holding" in support of his proposition that Eichler was not qualified to testify due to his lack of familiarity with the defendant. The trial court quickly realized, and noted after some additional discussion about the case, that the prosecutor had inadvertently cited the wrong case name and intended to cite *Gore.*

[13] In *Gore*, this court identified "four factors relevant to determining whether the witness is more likely to correctly identify the defendant than is the jury: (1) the witness' general level of familiarity with the defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." (Citations omitted.) *State* v. *Gore*, supra, 342 Conn. 151.

testimony on the ground that he lacked "any special familiarity with the defendant" apart from "having met [him] three times in jail . . . ."

We begin our analysis with the standard of review and governing legal principles. "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Bruny*, 342 Conn. 169, 187, 269 A.3d 38 (2022). We review the issue of whether the trial court applied the correct legal standard de novo. See, e.g., *State* v. *Manuel T.*, 337 Conn. 429, 453, 254 A.3d 278 (2020). The right to present a defense entails the right of the defendant to present his own facts for consideration alongside the state's version of events so that the jury "may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 817, 135 A.3d 1 (2016). We have previously established that "exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights . . . ." (Internal quotation marks omitted.) Id., 818–19.

Section 7-1 of the Connecticut Code of Evidence provides in relevant part that a lay witness "may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to . . . the determination of a fact in issue." Because "a witness who identifies the defendant in surveillance video or photographs testifies regarding material that the jury also is able to observe," lay testimony identifying an individual in surveillance footage will be admissible only if the trial court determines, on the basis of the totality of the circumstances, that "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph

[or video] than is the jury." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 342 Conn. 150.

Section 7-2 of the Connecticut Code of Evidence, on the other hand, provides in relevant part that an expert witness "may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Expert opinion testimony that pertains to the identification of a defendant in surveillance footage is generally admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn. 187.

The record reflects that, in considering the admissibility of Eichler's testimony, the trial court incorrectly applied the standard set forth in *Gore* for determining the admissibility of an identification by a nonpercipient witness—as opposed to the standard under *Bruny* for the admission of expert testimony. The use of the *Gore* standard, which "is grounded on the witness' general familiarity with the defendant's appearance or the witness' familiarity with the defendant's appearance at the time that the incident occurred"; *State* v. *Gore*, supra, 342 Conn. 150; is inapplicable to Eichler's proffered testimony. A brief review of *Gore* reveals as much. In *Gore*, this court concluded that the trial court properly admitted testimony concerning an identification of the defendant in a crime scene surveillance photo by his close friend. Id., 166. We observed that the friend's "long-standing and intimate association with the defendant," including his familiarity with the defendant at the time of the crime and the "quality of the photograph" supported the trial court's admission of the identification testi-

mony. Id., 165–66. None of these factors, with the exception of video quality, has any bearing on Eichler's ability to assist the jury in understanding the evidence. See Conn. Code Evid. § 7-2.

We agree with the defendant that the trial court should have applied the standard for expert testimony outlined in *Bruny* to determine the admissibility of Eichler's testimony. In *Bruny*, we concluded that the trial court acted within its discretion in admitting expert testimony of a forensic examiner to "assist the jury in its task of interpreting . . . surveillance footage." *State* v. *Bruny*, supra, 342 Conn. 194; see id., 186 ("In his testimony, [the expert] explained . . . how he tracked the movements of various individuals, who, except for the victim, were identified only by alphanumeric code, using video surveillance footage of the [crime scene] gathered from multiple camera angles. Although the defendant was depicted in the video footage . . . the identity of the defendant was left to the jury."). Although the trial court concluded that Eichler did not have "any special expertise" in identifying the defendant, Eichler was offered as a private investigator certified in forensic science with expertise in video analysis. Defense counsel argued that Eichler would testify that, moments before the shooting occurred, the victim could be seen walking down the street and around the Acura—as opposed to sitting in that vehicle. This testimony was key to contradicting Lockhart's testimony that the defendant had shot the victim from inside the Acura. Although defense counsel's proffer included that Eichler would identify the defendant and the victim, there was no real dispute about the identities of the individuals in the video. As the trial court acknowledged, Eichler's proffered testimony was largely in accordance with the state's theory regarding their identities. In light of its finding that the video was "less clear" when zoomed in, the trial court, under the proper

standard, should have determined whether Eichler possessed some skill or knowledge that would have assisted the jury in reviewing the street camera footage to evaluate the defense's contention that the victim was shot outside the Acura by someone other than the defendant. Because the trial court applied the incorrect standard, it made no findings as to whether Eichler's background and experience could conceivably assist the jury in making sense of the street camera footage. See, e.g., *State* v. *Genotti*, 220 Conn. 796, 807, 601 A.2d 1013 (1992) ("[e]xpert testimony is admissible if the witness possesses a special skill or knowledge directly applicable to a matter in issue . . . and the testimony would be helpful . . . in teaching the jury to view items of physical evidence by focusing [its] attention on certain salient features" (internal quotation marks omitted)).

The state contends that any error in precluding Eichler's testimony was harmless for two reasons: (1) the state's case was sufficiently strong such that Eichler's testimony would not have changed the outcome of trial, and (2) the testimony was cumulative. We disagree. Lockhart's credibility as an eyewitness was critical to the success of the state's case, and Eichler's testimony, if admitted, would have challenged her version of events. According to Eichler, the victim can be seen in the street camera footage walking on Pavilion Street when he was shot. This directly contradicts Lockhart's testimony that the victim was sitting in the Acura when he was first shot. It simply cannot be said, therefore, that testimony potentially discrediting the state's entire theory of the case would have had no effect on the outcome of the trial. See, e.g., *State* v. *Fernando V.*, 331 Conn. 201, 223–24, 202 A.3d 350 (2019) ("[when] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error" (internal quotation marks omitted)).

We also do not agree that Eichler's testimony was in any way cumulative. Because of the trial court's ruling, the portions of the video about which Eichler would have testified were never presented to the jury. Although the state introduced similar street camera footage, the video was a shorter clip, did not include the critical moments before the shooting about which Lockhart had testified, and was primarily relied on to demonstrate that the defendant had fled the scene in the Acura after the shooting. We therefore cannot conclude that the trial court's application of the incorrect legal standard in evaluating the admissibility of Eichler's testimony was harmless error. Accordingly, the case must be remanded for a new trial at which the correct standard must be applied.

## III

Finally, we address the defendant's claim that the trial court abused its discretion when it admitted expert testimony that one and two element particles commonly associated with and consistent with gunshot residue were detected on the defendant's hands, his clothing, and in the Acura.[14] The defendant contends that the state's use of the labels "commonly associated with" and "consistent with" to describe one and two element particles created a danger of unfair prejudice that outweighed the limited probative value of the testimony. The defendant further argues that the trial court abused its discretion in relying on *State* v. *Nieves*, 69 Conn. App. 96, 793 A.2d 290, cert. denied, 260 Conn. 930, 798 A.2d 972 (2002), to evaluate the admissibility of this evidence. The state responds that admitting the evidence relating to one and two element particles was a reasonable exercise of the trial court's discretion and that the trial court properly relied on *Nieves* in concluding that the proba-

---

[14] We address this claim because the issue is likely to arise on remand. See, e.g., *State* v. *Raynor*, 337 Conn. 527, 552, 254 A.3d 874 (2020).

tive value of this evidence outweighed the possibility of any undue prejudice. The state further contends that the defendant's arguments implicate the weight of the evidence, rather than its admissibility. We conclude that the trial court did not abuse its discretion in admitting the expert testimony.

The following additional facts are relevant to our resolution of this claim. Prior to trial, the defendant filed a motion to exclude the results of the gunshot residue testing pursuant to § 4-3 of the Connecticut Code of Evidence. Defense counsel argued that all of the gunshot residue test results should be excluded from evidence because the scientific labels used to describe them could mislead the jury to believe that one and two element particles "have much more evidentiary significance than they actually do . . . ." The prosecutor responded that the evidence was both relevant and probative, and that its expert would explain the difference between the labels, as well as identify other sources—such as brake pad dust—that could explain the presence of those elements on a person's hands or in a vehicle. He argued that the state was "not in any way attempting to characterize what was found on the [samples] as characteristic of gunshot residue."

The trial court evaluated the five positive samples collected from the defendant's hands, his clothing, and the Acura. Only lead was identified in the sample from the defendant's left front pocket. Barium and antimony were found in the sample from the right cuff of the defendant's sweatshirt, and only barium was found in the sample from the defendant's right hand. Additionally, two elements were each identified in samples from the driver's side and passenger side interior headliners of the Acura. On the driver's side, barium and antimony were found. On the passenger side, lead and antimony were found. No sample that the state collected contained particles comprised of all three elements.

Citing *State* v. *Nieves*, supra, 69 Conn. App. 96, the trial court determined that gunshot residue test results indicating the presence of particles containing only one or two elements of gunshot residue were admissible. The court explained that, in *Nieves*, the expert testified that "lead is the element most commonly found in gunshot residue, followed by barium, and then antimony." Relying on this testimony, the court concluded that the test results for the samples collected from the defendant's left front pocket and the Acura's passenger side interior headliner were admissible because they both indicated the presence of lead particles. The court additionally concluded that the test results for the samples collected from the defendant's right cuff and the Acura's driver's side interior headliner, which indicated the presence of particles comprised of barium and antimony, were also admissible.[15] It determined that the probative value of the samples containing particles with only barium and antimony outweighed the risk of unfair prejudice, especially because other samples containing lead were found nearby and the state's expert would testify as to other potential sources of all three ele-

[15] In making its ruling, the trial court also stated: "I think testimony that findings are consistent with a conclusion is typical in scientific evidence. For example, witnesses testify that findings consistent with the defendant's DNA profile is admissible testimony. See, for example, *State* v. *Washington*, [155 Conn. App. 582, 587, 110 A.3d 493 (2015)]." On appeal, the defendant argues that the trial court's reliance on *Washington* undermines the basis of its ruling because, in that case, the use of the term "consistent with" was used to identify the defendant's DNA profile, which "exalts the highly tenuous value of these scientific findings to the same level as DNA matches." We disagree. Although it is true that the meaning of "consistent with" as applied to gunshot residue particles differs when it is applied to DNA, the trial court relied on *Washington* to demonstrate only that the same terminology is admissible in other contexts. Moreover, at trial, the state's expert explained her use of the term "consistent with," allowing the jury to understand that it referred to the presence of two elements of gunshot residue in a given particle. Finally, we do not view the trial court's reference to *Washington* as central to its admission of the gunshot residue test results but, rather, as a sidenote reflecting understanding of language that is commonly used when presenting scientific evidence to a jury.

ments. The trial court excluded the test result for the sample collected from the defendant's right hand, which contained only barium particles.[16]

The following day, the state called its expert witness, Allison Gingell, a chemist with the state forensic science laboratory, to testify as to the results of the gunshot residue testing. Gingell explained that, when a gun is fired, the heat causes a chemical reaction that results in the formation of particles containing the elements lead, barium, and antimony, all fused together; the shot creates a "plume" that deposits the fused particles on a person's hands and clothing. She further explained that lead, barium, and antimony can be present on a person who has recently handled fireworks or an air gun, or who has been near brake pads or airbags. Gingell testified that, when a particle has all three elements, it is classified as "characteristic of" gunshot residue, which she described as "the top tier of the reporting conclusions for gunshot residue . . . ." She further testified that, when only two of the three elements are found, "it's kind of like a cone, and it opens up so there's more sources because you would have a conclusion that says that you're consistent with elements of primer gunshot residue." Finally, she testified that a test result with only one of the three elements is "commonly associated with" gunshot residue.

Through Gingell, the state then presented each of the gunshot residue test results for the samples collected from the defendant's hands, his clothing, and the Acura consistent with the trial court's ruling on admissibility. Gingell further testified that several samples were tested in which none of the pertinent particles was found, including samples collected from, among other

---

[16] Despite the trial court's pretrial ruling excluding the test result for the sample that contained only barium, the state's expert testified as to the positive test result pertaining to the defendant's right hand. The defendant did not object during trial and does not claim error, in this regard, on appeal.

places, the right pocket and the inside waistband of the defendant's jeans, the Acura's passenger side interior door handle, and the bottom of the Acura's steering wheel. The testing of other samples, including those from the defendant's left hand, the Acura's driver's side interior door handle, and the top of the Acura's steering wheel, was determined to be inconclusive. According to Gingell, lab policy dictates that a sample is categorized as "inconclusive" when "particles [are] screened but not confirmed." She further explained that finding all three elements in separate particles in a single area is not the same as when they are fused together, that no one element is more consistently found than the others when a gun is fired, and that particles will remain on a surface for as long as a month, until another event occurs, such as another person's touching the surface.

The defendant presented his own gunshot residue expert, James Gannalo, who testified that particles with only one or two elements "cannot be considered gunshot residue . . . ." Gannalo explained, consistent with the state's expert, that all three elements comprising gunshot residue can derive from sources other than gunfire: lead particles can come from paint, barium is used in manufacturing glass bottles and stained glass, and antimony is used as "a hardener for metal," especially in brake pads. Gannalo further testified that the use of hand solvents—including sanitizer—with vigorous rubbing would certainly affect the presence and composition of gunshot residue particles on a person's hands.

As a preliminary matter, we set forth the standard of review. "It is well established that a trial court's ruling on evidentiary matters will not be disturbed unless the court abused its discretion." *State* v. *Bember*, 349 Conn. 417, 441, 316 A.3d 297 (2024). Concerning expert testimony specifically, we afford the trial court "wide discretion in determining whether to admit expert testimony

and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision." (Internal quotation marks omitted.) *Fleming* v. *Dionisio*, 317 Conn. 498, 505, 119 A.3d 531 (2015).

We are further guided by the following relevant legal principles. Section 4-3 of the Connecticut Code of Evidence provides in relevant part: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury . . . ." See *State* v. *Porter*, 241 Conn. 57, 90, 698 A.2d 739 (1997) ("scientific evidence, like all evidence, is properly excluded if its prejudicial impact outweighs its probative value"), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Evidence that may be excluded under this rule "is not to be confused with evidence that is merely damaging. . . . All evidence adverse to a party is, to some degree, prejudicial." (Internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 806, 614 A.2d 414 (1992). "[B]ecause of the difficulties inherent in [the balancing process under § 4-3] . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 322–23, 253 A.3d 458 (2020). "[T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears [on] its weight . . . ." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 609, 175 A.3d 514 (2018).

The defendant contends that the trial court abused its discretion in admitting the one and two element particle gunshot residue evidence because any limited

probative value was outweighed by the risk of unfair prejudice created by "the scientific imprimatur" of the evidence. The defendant argues that the labels used by the state's expert to describe one and two element particles—"commonly associated with" and "consistent with" gunshot residue, respectively—are highly likely to mislead a jury into interpreting evidence as more significant than it truly is, thus, creating unfair prejudice. We disagree.

In considering whether the trial court abused its discretion in admitting the one and two element particle gunshot residue evidence, we note that courts routinely have admitted such evidence. See, e.g., *State* v. *Tomlinson*, 340 Conn. 533, 560, 264 A.3d 950 (2021) (two element particles of lead and barium consistent with gunshot residue and one element particles of lead commonly associated with gunshot residue were admitted at trial); *State* v. *Thompson*, 266 Conn. 440, 451–52, 832 A.2d 626 (2003) ("gunshot residue test[ing] performed on the jacket [that the defendant had been seen wearing on the night of the shooting] revealed one particle of lead and one particle of antimony, both of which are consistent with gunshot residue"); *State* v. *Milner*, 197 Conn. App. 763, 775, 232 A.3d 1 ("forensic analysis revealed that the white shirt found at the scene contained particles [containing the elements antimony and barium, which are] consistent with, although not definitively establishing, the presence of gunshot residue"), cert. denied, 335 Conn. 928, 235 A.3d 525 (2020); see also *State* v. *Sims*, Docket No. A21-0996, 2022 WL 2195544, *4 (Minn. App. June 20, 2022) ("[Expert] testimony assisted the jury in determining an important fact at issue in the case: whether [the defendant] fired a gun on the day of the shooting. Although the evidence indicated that [the defendant's] hands contained only [two element] particles, rather than [three element] particles—and did not conclusively demonstrate that [he]

fired a gun on that day—the evidence of [two element] particles nonetheless [made] that possibility appear more likely than if the test had been negative. . . . It was therefore helpful to the jury to know the results of the [gunshot residue] tests, and it was up to the jury to determine the weight of that evidence." (Citation omitted.)), review denied, Minnesota Supreme Court, Docket No. A21-0996 (September 20, 2022).

In *State* v. *Nieves*, supra, 69 Conn. App. 96, the Appellate Court concluded that the trial court had not abused its discretion in admitting expert testimony on the results of gunshot residue testing, which revealed only one element particles of lead on the defendant's hands. Id., 105. In finding no abuse of discretion, the court reasoned that the relevance of this evidence outweighed any risk of undue prejudice and that it was for the jury to determine how much weight to assign the evidence. Id. In reaching its determination, the court further reasoned that the prejudicial impact of the evidence was mitigated by the expert's testimony that other environmental factors could explain the presence of the lead on the defendant's hands and that, "without barium and antimony, the presence of only lead is less significant than a finding of all three elements." Id. Likewise, in the present case, Gingell informed the jury that, to constitute gunshot residue, all three elements would need to be present and fused together. She also identified other sources in the community that could explain the presence of barium, antimony, or lead on the defendant's person and in his vehicle. This testimony sufficiently mitigated any risk of unfair prejudice or misleading the jury. See, e.g., *State* v. *Booth*, 250 Conn. 611, 646–47, 737 A.2d 404 (1999) ("[t]he jury was aware that the samples [of gunshot residue] were not retrieved immediately after the murder . . . and that the results may have been affected by the passage of time and the intervening use of the car," and, "therefore, [it] could

have considered these facts when deciding what weight to give the test results"), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).[17]

The defendant contends nonetheless that the expert's use of the labels "consistent with" and "commonly associated with" exacerbated the risk of unfair prejudice. We are not persuaded. The record reveals that Gingell testified that "consistent with" gunshot residue is used to describe a result "having two out of the three" elements and that "commonly associated with" is used to describe a result "[having] one out of the three elements present." She further testified that merely because a result was consistent with or commonly associated with the presence of gunshot residue did not mean that the defendant had fired a gun and that the actual source of the elements cannot be determined. In other words, she provided the jury with the information it needed to fully evaluate and weigh the significance of the gunshot residue evidence, thereby sufficiently mitigating any potential confusion the terminology may otherwise have caused. See, e.g., *State* v. *Fuller*, 56 Conn. App. 592, 616–17, 744 A.2d 931 (holding that trial court did not abuse its discretion in admitting expert's testimony that identified particles that were "consistent with . . . gunshot residue" and observing that admissibility is "not based [on] the semantics of the expert or his or her use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony" (internal quotation marks omitted)), cert. denied, 252 Conn. 949, 748 A.2d 298, cert.

---

[17] The defendant also argues that the trial court abused its discretion in "view[ing] itself bound by *Nieves*" because that case "involved a different type of testing, a different era in this science, and a much more modest form of testimony . . . ." We disagree. The trial court relied on *Nieves* as an illustration of how a court may weigh the probative value of one element particles against the potential for unfair prejudice. The method used to detect the particles, forming the basis for the expert testimony, does not impact the applicability of *Nieves* to the present case.

denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000); *State* v. *Loving*, 775 N.W.2d 872, 879 (Minn. 2009) ("[T]he record does not sustain the claim that the probative value of the [gunshot residue] evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The jury was informed of evidentiary limitations and what conclusions could and could not be drawn from it (i.e., that there are a number of ways that [gunshot residue] can be transferred, and that no priorities should be given to the various possibilities). The [D]istrict [C]ourt therefore did not abuse its discretion in admitting the [gunshot residue] evidence . . . ."); *Ware* v. *State*, 301 So. 3d 605, 617 (Miss. 2020) ("[Although the expert] discussed three scenarios that could result in the presence of gunshot residue on a person's hands, he clearly explained that the presence of gunshot residue on [the defendant's] palms did not unequivocally prove that [the defendant] had fired a gun. Because [the expert's] testimony was explained, there is little risk that the jury was confused or misled by the testimony."). In light of the foregoing, we conclude that the trial court did not abuse its discretion in admitting Gingell's testimony that one and two element particles commonly associated or consistent with gunshot residue were detected on the defendant's hands, his clothing, and in the Acura.[18]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

---

[18] Although the trial court did not abuse its discretion in admitting the challenged testimony in the present case, we remind trial courts that it is within their discretion to require witnesses, including expert witnesses, to avoid using terminology that risks causing inadvertent confusion or misunderstanding for jurors. In the context of testimony regarding gunshot residue, if a court is of the opinion that such a risk is presented by an expert's use of terms like "consistent with" or "commonly associated with," it may instruct the witness and counsel to employ terms that mitigate that concern.